

1  ANDREW V. JABLON (SBN 199083)
   E-Mail: ajablon@rpblaw.com
2  LINDSAY D. MOLNAR (SBN 275156)
   E-Mail: lmolnar@rpblaw.com
3  RESCH POLSTER & BERGER LLP
   9200 Sunset Boulevard, Ninth Floor
4  Los Angeles, California 90069-3604
   Telephone: 310-277-8300
5  Facsimile: 310-552-3209

6  Attorneys for Defendant Robert Stein

7



FILED
CLERK U.S. DISTRICT COURT

MAR 18 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

8                 UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11  SCOTT BARBOUR, individually, and       Case No. CV11-02335 DMb(JCGx)
    ZB FAMILY TRUST, SCOTT
12  BARBOUR, Trustee,                      NOTICE OF REMOVAL OF
                                           ACTION UNDER 28 U.S.C. §1441(b)
13              Plaintiffs,                (FEDERAL QUESTION)

14        vs.                             Trial Date:    None Set

15  BRET SAXON, an individual;
    CONDUIT MEDIA, INC., a California
16  corporation; TMP, INC., aka
    TRANSACTIONAL MARKETING
17  PARTNERS, INC., a California
    corporation; ROB STEIN, an
18  individual; and DOES 1 through 50,
    Inclusive,
19
                Defendants.
20

21

22  TO:   THE CLERK OF THE ABOVE ENTITLED COURT:

23        PLEASE TAKE NOTICE that defendant Robert Stein (sued as Rob Stein)

24  ("Stein") hereby removes to this Court the state court action described below.

25        1.     This action is a civil action of which this Court has original jurisdiction

26  under 28 U.S.C. § 1331, and is one which may be removed to this Court by

27  defendants pursuant to the provisions of 28 U.S.C. § 1441(b) in that it arises under

28  18 U.S.C. § 1961 et seq. and is founded on a claim or right arising under the laws of

414902.1

1    the United States.

2         2.    On February 4, 2011, an action was commenced in the Superior Court
3    of the State of California for the County of Los Angeles entitled *Scott Barbour, et*
4    *al. v. Bret Saxon, et al.*, bearing Case No. SC 111353.  A copy of the complaint is
5    attached hereto as Exhibit "A".

6         3.    The first date upon which defendant Stein received a copy of the
7    complaint was February 17, 2011, when Stein was served with a copy of the
8    complaint and a summons from the state court.  Stein is informed and believes, and
9    based thereon alleges, that the remaining defendants were served on or after the
10   same date.

11        4.    All other defendants have joined in this Notice of Removal, as
12   evidenced by the joinder attached hereto as Exhibit "B".

13   Dated: March 17, 2011              RESCH POLSTER & BERGER LLP

14

15

16                          By:

17                               ANDREW V. JABLON
                                 Attorneys for Defendant Robert Stein
18

19

20

21

22

23

24

25

26

27

28

resch polster & berger llp

414902.1                          2

EXHIBIT "A"

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

FEB 04 2011

John A. Clarke, Executive Officer/Clerk

By ___A. WILLIAMS___ DEPUTY

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
BRET SAXON, an individual; CONDUIT MEDIA, INC., a California corporation;

Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
SCOTT BARBOUR, individually and ZB FAMILY TRUST, SCOTT BARBOUR, Trustee

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES<br>WEST (Santa Monica)<br>1725 Main Street, Santa Monica, CA 90401 | CASE NUMBER:<br>*(Número del Caso):*<br>**SC111353** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
DAVID M. MARCUS, Esq.     (Bar # 90460)     Fax No.: (310) 284-2025
MARCUS, WATANABE & DAVE, LLP, 1901 Avenue of the Stars, Suite 300, Los Angeles, CA 90067-6005     Phone No.: (310) 284-2010

DATE: **FEB 04 2011**     JOHN A. CLARKE     Clerk, by _____Williams_____ , Deputy
*(Fecha)*                           *(Secretario)*                                  *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☒ as an individual defendant.   ROB STEIN, an individual
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under:  ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| BARBOUR vs. SAXON, et al. | |

## INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

TMP, INC., aka TRANSACTIONAL MARKETING PARTNERS, INC., a California corporation; ROB STEIN, an individual; and DOES 1 through 50, Inclusive

Page ___2___ of ___2___

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

*LexisNexis® Automated California Judicial Council Forms*

1   **DAVID M. MARCUS, Esq.** (SBN 90460)
    **MARCUS, WATANABE & DAVE, LLP**
2   1901 Avenue of the Stars, Suite 300
    Los Angeles, California 90067-6005
3   Telephone: (310) 284-2020
    Facsimile: (310) 284-2025
4
    **MICHAEL KERRY BURKE, Esq.** (SBN 133417)
5   **BURKE & ASSOCIATES**
    1901 Avenue of the Stars, Suite 300
6   Los Angeles, California 90067-6005
    Tel: (310) 277-7414
7
    *Attorneys for* Plaintiffs,
8   SCOTT BARBOUR, individually, and
    ZB FAMILY TRUST, SCOTT BARBOUR, Trustee
9

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

FEB 04 2011

John A. Clarke, Executive Officer/Clerk
By __A. WILLIAMS__
                              DEPUTY

10          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11          **FOR THE COUNTY OF LOS ANGELES, ~~CENTRAL~~ DISTRICT**

12                              West

13   SCOTT BARBOUR, individually, and          )   CASE NO.
     ZB FAMILY TRUST, SCOTT BARBOUR,           )
14   Trustee,                                  )     **SC111353**
                                               )
15                    Plaintiff,               )   **COMPLAINT FOR:**
                                               )
16   vs.                                       )   1) **FRAUD;**
                                               )   2) **BREACH OF CONTRACT;**
17   BRET SAXON, an individual; CONDUIT        )   3) **MONEY HAD AND RECEIVED;**
     MEDIA, INC., a California corporation;    )   4) **BREACH OF CONTRACT**
18   TMP, INC., aka TRANSACTIONAL              )      **(COMMISSIONS DUE);**
     MARKETING PARTNERS, INC., a               )   5) **RICO CONSPIRACY [VIOLATION**
19   California corporation; ROB STEIN, an     )      **OF 18 U.S.C. § 1961, et seq.]**
     individual; and DOES 1 through 50,        )
20   Inclusive,                                )
                                               )
21                    Defendants.              )   CASE MANAGEMENT CONFERENCE
                                               )
22   _____  )        MAY 25 2011

23                                                          Date

24   ///
                                                 GERALD ROSENBERG
25   ///
                                                 Dept K  830am
26   ///

27   ///

28   ///

                                         1

## FACTS COMMON TO ALL CLAIMS

1. SCOTT BARBOUR ("Barbour") is an individual residing in the County of Los Angeles, State of California.

2. The ZB FAMILY TRUST ("ZB Family Trust") is a trust located within the County of Los Angeles, State of California. SCOTT BARBOUR is the Trustee of the ZB Family Trust.

3. Defendant BRET SAXON ("Saxon") is, and at all times related to this Complaint was, a resident of the County of Los Angeles, State of California. Saxon is the principal in a number of film production companies located in California.

4. Defendant ROB STEIN ("Stein") is, and at all times related to this Complaint was, an individual residing in the County of Los Angeles, State of California. Stein is the accountant, bookkeeper, and finance executive of one or more of Saxon's business entities, has performed accounting and banking work with and for Saxon for many years, and is intimately familiar with all aspects of the books, records, and banking of Saxon and his entities.

5. Plaintiffs are informed and believe and thereon allege that IMG FILMS, INC., aka INSOMNIA MEDIA GROUP ("Insomnia" or "IMG") is a business entity form unknown, with its principal place of business in County of Los Angeles, State of California. IMG may have been the enterprise through which frauds were committed.

6. Plaintiffs are informed and believe and thereon allege that CONDUIT MEDIA, INC. ("Conduit"), is a California corporation organized and operating under the laws of the State of California with its principal place of business in the County of Los Angeles, State of California. Conduit may have been the enterprise through which frauds were committed.

7. Plaintiffs are informed and believe and thereon allege that TMP, INC., aka TRANSACTIONAL MARKETING PARTNERS, INC. ("TMP"), is a California corporation organized and operating under the laws of the State of California with its principal place of business in County of Los Angeles, State of California.

8. Plaintiffs do not know the true names or capacities of the Defendants designated in this Complaint as DOES 1 through 50, inclusive, but are informed and believe and allege thereon that each fictitiously named Defendant is in some way related to or connected with the named

2

ARCUS, WATANABE
DAVE, LLP

1    Defendants, and is liable to Plaintiffs.  When Plaintiffs learn the true names and capacities of the

2    fictitiously designated Defendants, they will amend the Complaint.

3          9.      Plaintiffs are informed and believe and thereon allege that Defendant Saxon is a

4    motion picture and television producer, and has been in that business for at least five years.  Saxon

5    is the sole or principal shareholder, owner, and controlling force of the business entities TMP,

6    Conduit, and Insomnia.

7          10.     Plaintiffs are informed and believe and allege thereon that there is sufficient unity

8    of interest between and among BRET SAXON, the individual, and the business entities TMP,

9    Conduit, and Insomnia in that (a) the corporate formalities have not been followed, (b) the

10   corporations or business entities have been inadequately capitalized, (c) the funds of Saxon and the

11   funds of the various entities have been commingled and the funds of the entities are used by Saxon

12   for his personal use, and (d) that the business entities are mere shells or instrumentalities for Saxon

13   such that it would create an injustice to allow the corporate or entity status of these business entities

14   to stand and that the liability of any of the business entities toward the Plaintiffs would also be borne

15   by the other business entities and by BRET SAXON and vice versa.

16   **BACKGROUND FACTS**

17      **SAXON'S APPEARANCE OF A LUXURY LIFESTYLE**

18         11.     Saxon's lifestyle and professional image are well known to Plaintiffs and others, and

19   Saxon uses that image to project an aura of success and financial solvency.  Saxon claimed to own

20   a 14,000-square-foot ranch in Tennessee, which was to be the base for at least three films he stated

21   he would film and produce there.  Saxon also owns a 10,900-square-foot home in Pacific Palisades,

22   California, which includes a tennis court, swimming pool, and film theater, at which he entertains

23   clients and potential investors.   Saxon frequently flies in private jets, often traveling with friends

24   and/or mistresses/girlfriends to Las Vegas, to sporting events, and to luxurious destinations. Saxon

25   has had a number of exotic or luxury cars for his use, including four (4) Mercedes, a Bentley, and

26   a Ferrari.  Saxon employs a housekeeper, a nanny, a tennis coach at his home, and a personal trainer

27   (that travels with Saxon).   Saxon frequently entertained and used an exclusive Black American

28

ARCUS, WATANABE
DAVE, LLP

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

1   Express credit card, which Plaintiffs allege and believe does not belong to Saxon, and is backed by

2   an account not issued in Saxon's name.

3       12.    Plaintiffs are informed and believe and thereon allege that Plaintiff SCOTT

4   BARBOUR and Defendant Saxon have been acquainted for approximately eleven (11) years.

5   **FRAUDULENT CONDUCT RELATED TO REVENUE OBTAINED BY BARBOUR**

6       13.    In or about January 2008, Plaintiff Barbour became employed by TMP in an executive

7   sales and account management position. Plaintiff Barbour had a monthly compensation consisting

8   of a draw against either forty percent (40%) of revenues from clients derived from Barbour's effort

9   or twenty percent (20%) from those where another party was involved or originated the client.

10       14.    Plaintiffs are informed and believe and thereon allege that Saxon produced films

11   using another entity, IMG/Insomnia, as his vehicle for approximately five (5) years.

12       15.    During the entire course of their business relationship, Defendant Saxon actively

13   concealed from Plaintiffs that he and his companies were insolvent, and engaged in a purposeful

14   course of conduct to conceal, deceive and mislead Plaintiffs and others into believing that Saxon was

15   financially solvent and able to satisfy his debts and liabilities as and when they came due. Plaintiffs

16   are informed and believe that in fact, Saxon could not pay his personal or business expenses as and

17   when they came due; Plaintiffs are informed and believe that Saxon owed numerous business

18   contractors, employees, script writers, and creditors money on his various business projects.

19       16.    Beginning in May, 2010, TMP ceased paying Plaintiff Barbour his commission

20   (although he continued to receive his monthly draw, which was a fraction of the sums due to Plaintiff

21   Barbour). To the date of filing of this Complaint, the unpaid commissions due Plaintiff are

22   approximately $60,372.00 and continuing to accumulate from revenues received by Saxon and TMP

23   on accounts obtained by Barbour. A true and correct copy of the accounting statement prepared by

24   TMP itself for these commissions is attached to this Complaint as Exhibit "A" and is incorporated

25   herein by reference. Plaintiff is informed and believes that all of the monies which created liability

26   for said commissions have been received and deposited by Defendants, and Defendants have failed

27   and refused to pay Plaintiffs as and when such sums have become due. Barbour is informed and

28   believes, and thereon alleges, that Saxon and Stein diverted the monies and revenues earned by

4

RCUS, WATANABE
)AVE, LLP

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

1   Barbour to other enterprises and/or for other personal purposes, and intended by such diversion to

2   defraud Barbour out of sums earned and due to him.  Such revenues obtained by Barbour were also

3   intended to help maintain the solvency of TMP, which is in doubt as a result of Defendants'

4   misconduct, actions and omissions.

5   **DEFENDANTS' MISREPRESENTATIONS RELATING TO THE FIRST**

6   **FRAUDULENTLY OBTAINED LOAN**

7        17.    On or about May 28, 2010, Saxon approached Barbour and asked Barbour to loan him

8   $150,000.00 for two weeks.  Saxon represented to Barbour that substantial funds in his corporate

9   accounts were frozen due to a pending lawsuit filed against him in Tennessee, and also that he and

10  his companies were expecting monies from their Egyptian capital partners "in a matter of days."

11  Saxon never disclosed to Barbour that the Tennessee lawsuit alleged claims for intentional fraud and

12  wrongful diversion of funds for those loans and investments.  Saxon also failed to disclose that,

13  contrary to his press release that Saxon and IMG had received a $550 Million investment from Borak

14  Holdings (an Egyptian capital fund), Saxon in fact had no capital backing or short-term financing

15  from an Egyptian investor group (Borak).

16       18.    At Saxon's instructions, Barbour made out the check to Conduit, an entity unknown

17  to Barbour.

18       19.    Barbour relied on Saxon's misrepresentations in making the loan for the two-week

19  period.  Had Barbour known the true nature of the claims against Saxon, or the truth about the

20  purported Egyptian movie financing for Saxon and his entities, Barbour would not have loaned any

21  monies to Saxon or his entities.

22       20.    Plaintiffs' $150,000.00 loan was drawn on an account in the name of the ZB

23  FAMILY TRUST.  A true and correct copy of the check representing this loan is attached to this

24  Complaint as Exhibit "B" and is incorporated herein by reference.

25       21.    Defendant Saxon also represented to Plaintiff that he had a concern that Barry

26  Minkow had access to Saxon's personal and business account information.

27       (a)    Minkow had previously been convicted of defrauding investors in the ZZZ

28  Best Carpets case, and was also being sued for fraud in a number of securities suits involving

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

1    Minkow's new company, FDI.  Minkow's prior criminal misconduct and his new activities are the

2    subject of a film project between Minkow and Saxon.

3           (b)    Minkow is an investor and co-producer of the documentary with Saxon,

4    nominally entitled "Minkow".

5           (c)    Plaintiffs are informed and believe that Saxon hired a private investigator to

6    discover whether and how Minkow obtained information concerning Saxon's bank accounts, which

7    had become an issue between the two of them in their own film financing and investor/creditor

8    dealings.

9           (d)    Plaintiffs are informed and believe and thereon allege that Minkow was

10   concerned that he, too, has been defrauded by Saxon and/or IMG in the production of the film and

11   the handling of investment funds.

12          22.    Plaintiffs are informed and believe and thereon allege that the basis of the Yarbrough

13   Productions lawsuit mentioned by Saxon as a reason for his failure to pay Barbour – the actual and

14   factual basis of which **was not disclosed to Barbour** – was an agreement between those parties that

15   Yarbrough would invest $1.5 million of $5 million needed to make a motion picture, and that Saxon

16   and/or his entities would put up the remaining $3.5 million.  Saxon's concealment, omission, and

17   failure to disclose the true nature of the Yarbrough action was intended to perpetrate a fraud on

18   Barbour, by causing Barbour to rely to his detriment on the misrepresentations by Saxon that any

19   "freeze" on his bank accounts or finances was a temporary and routine matter in the ordinary course

20   of business.

21          (a)    Plaintiffs are informed and believe and thereon allege that under the terms of

22   the agreement between Saxon and Yarbrough, the Saxon entity for producing the movie was

23   prohibited from utilizing any of the money in the picture account until one hundred percent (100%)

24   of the combined financing had been received in the account.  Instead, according to the allegations

25   in the Yarbrough complaint (and in violation of their agreement), Saxon took a portion of the

26   $1.5 million Yarbrough invested and made several unauthorized transfers to create the illusion that

27   the balance of the money came from Saxon and/or his business entities, even though only Yarbrough

28

6

ARCUS, WATANABE
DAVE, LLP

1   actually put up any money. A true and correct copy of the Yarbrough complaint and the Final Order

2   finding Saxon liable for non-dischargeable intentional fraud are attached as Exhibit "C."

3          (b)    Plaintiffs are informed and believe and thereon allege that Defendant Stein

4   was aware of the terms of the original investment agreement, and conspired with Saxon and IMG

5   to create the money trail of bank accounts and give the false appearance of the investments made by

6   IMG/Saxon, in furtherance of the fraud. Stein had a role in asking for and receiving the funds from

7   Barbour, and concealed from Barbour the true facts.

8         23.    Although Saxon promised to repay the loan to the ZB Family Trust within two weeks,

9   or no later than June 11, 2010, Saxon did not repay the funds.

10         24.    In July, 2010, Saxon informed Barbour that he was in the process of selling stock he

11   owned to raise funds to repay the loan.

12         25.    Plaintiffs are informed and believe and thereon allege that on July 29, 2010, Saxon

13   represented to Barbour that he "had a check in his pocket" for Barbour for repayment of the loan.

14         26.    Plaintiffs are informed and believe and thereon allege that despite Saxon's

15   representation that the funds were in hand to repay the ZB Family Trust, they were never paid to

16   Plaintiff.

17   **SAXON AND STEIN'S FRAUDULENT MISCONDUCT IN TAKING MONEY**

18   **FROM BARBOUR'S BANK ACCOUNT WITHOUT ANY SIGNED**

19   **AUTHORIZATION**

20         27.    In August, 2010, while Plaintiff Barbour was on vacation in the Mediterranean, Saxon

21   sought to borrow an additional $250,000.00, hoping to repay these sums by the time Barbour

22   returned from his vacation.

23         28.    Plaintiffs are informed and believe and thereon allege that without any signed

24   agreement from Barbour and without any signed instructions from Barbour to his bank, Defendant

25   ROB STEIN, the accountant and bookkeeper for Saxon and his entities, went to a Bank of America

26   branch and transferred $250,000.00 from the ZB Family Trust into Saxon's own personal account.

27   A true and correct copy of the transfer is attached as Exhibit "D."

28         29.    This $250,000.00 has never been repaid, though Saxon has acknowledged the debt.

7

ARCUS, WATANABE
DAVE, LLP

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

1    **SAXON OBTAINS FURTHER BRIDGE FUNDING LOANS BY FALSE PROMISES**

2    **OF CASH TRANSFERS FROM HIS EGYPTIAN INVESTORS**

3        30.    On or about August 16, 2010, Saxon claimed that he was traveling to Egypt and

4    informed Barbour that his reason for going was to pick up a check from his Egyptian capital

5    investors, Borak Holdings. Upon his return (on or about August 19), Saxon informed Barbour that

6    his Egyptian investors were sending a check the next week and that he needed to borrow

7    $150,000.00 more from Barbour to keep his projects going. Saxon represented to Barbour that all

8    of his own funds were tied up in his projects and that his Egyptian investors were participants in

9    these ongoing projects.

10        (a)    Plaintiffs are informed and believe and thereon allege that the Egyptian

11    investors purportedly involved are the principals of Borak Holdings, the subject of a November 2007

12    press release prepared by Saxon and IMG and released to the general public, claiming that IMG had

13    received $550,000,000 ($550 Million Dollars) in financial backing from Borak Holdings. A true

14    and correct copy of the article and press release put out by Saxon and IMG announcing the financing

15    and capital backing is attached as Exhibit "E."

16        (b)    Plaintiffs are informed and believe and thereon allege that the claimed

17    investment was never made by Borak Holdings, and that no substantial general investment funds

18    were ever provided to Saxon/IMG by Borak Holdings. However, the representations by Saxon of

19    such funds, which representations were false and known by Saxon to be false at the time that they

20    were made, caused Plaintiffs (and other investors) to rely to their detriment on the promises of

21    repayment by Saxon and/or IMG. Plaintiffs are informed and believe that Borak Holdings was a

22    capital investor or lender on only two films with Saxon and/or IMG, and that Borak made loans of

23    over $1 million to Saxon for a movie that never got made (but for which Saxon took all of the loan

24    proceeds). Plaintiffs are informed and believe that Saxon took such funds and converted them to

25    uses other than that for which they were intended, including for Saxon's personal use and to fund

26    and otherwise maintain the enterprise.

27        31.    Plaintiffs are informed and believe and thereon allege that on or about August 24,

28    2010, Barbour loaned to Saxon the $150,000.00 requested. A true and correct copy of the check

8

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

1   representing this loan is attached to this Complaint as Exhibit "F" and is incorporated herein by
2   reference.

3           32.     Saxon represented in writing that all sums loaned or taken for his benefit were due
4   upon demand and would be repaid by September 1, 2010. A true and correct copy of this promissory
5   note is attached to this Complaint as Exhibit "G" and is incorporated herein by reference.

6           33.     Despite demand by Barbour, the monies loaned were not repaid on or after
7   September 1, 2010.

8           34.     Barbour relied on Saxon's misrepresentations in agreeing to make this additional loan
9   for the one-week period.   Had Barbour known the true nature of the purported Egyptian financing
10  for Saxon and his entities, or the true status of the lawsuits, pending claims, and projects that Saxon
11  was involved in, Barbour would not have loaned any monies to Saxon or his entities.

12          **SAXON BOUNCES HIS CHECK TO REPAY THE LOANS TO BARBOUR**

13          35.     Plaintiffs are informed and believe and thereon allege that on or about September 1,
14  since none of the $550,000.00 had been repaid, Barbour made a demand on Saxon for all sums
15  loaned and for all sums due.   Saxon represented to Barbour that the Egyptian cash transfer was
16  imminent, but then later in September he informed Barbour that the Egyptian investors would not
17  send their money until the fourth quarter, beginning October 1.

18          36.     Plaintiffs are informed and believe and thereon allege that on or about October 1,
19  2010, Saxon began to provide myriad excuses to Plaintiff setting out the reasons that he could not
20  repay the money at that time.

21          37.     Plaintiffs are informed and believe and thereon allege that Saxon subsequently
22  provided the ZB Family Trust with a personal check for $550,000.00, postdated to October 18, 2010.

23          38.     The check was deposited in January 2011, and returned for insufficient funds.
24  Plaintiffs are informed and believe and thereon allege that at no time since Saxon provided the check
25  were there sufficient funds in the account to enable the check to be cashed and deposited. A true and
26  correct copy of the check returned from the bank for insufficient funds is attached to this Complaint
27  as Exhibit "H" and is incorporated herein by reference.

28

Marcus, Watanabe
& Dave, LLP

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

39.     At present, Saxon and the various business entities are obligated to repay Plaintiff ZB Family Trust $550,000.00, plus interest, comprised of three (3) loans: (1) a loan of $150,000.00 made on May 28, 2010; (2) a bank transfer on August 3, 2010, in the amount of $250,000.00; and (3) a check on August 24, 2010, to BRET SAXON in the amount of $150,000.00.

40.     Plaintiffs are informed and believe and thereon allege that, furthermore, Defendants are liable to Plaintiff Barbour in the amount of at least $60,712 for commissions that were due and payable when earned as reflected in TMP's own account statement, but have been withheld and not paid, and misappropriated by the Defendants, and each of them, and further sums due from such accounts, subject to an accounting.

## SAXON'S FALSE REPRESENTATIONS CONCERNING POTENTIAL COLLATERAL FOR THE LOANS

41.     Plaintiffs are informed and believe and thereon allege that, among other things, the Plaintiffs made the loans to the Defendants based upon the representations by Defendants not only of the creditworthiness of their projects but also as a result of representations by Saxon of numerous sources of revenues for him that would be used to repay Plaintiffs, and Saxon's individual real estate holdings, including a large ranch in Memphis, Tennessee, and a mansion in Pacific Palisades, California, that could stand as collateral. As is set forth below, many of these representations were false and untrue at the time that they were made, and were designed to conceal the true state of Saxon's affairs from his creditors and to deceive Barbour (and other creditors).

### Ownership of the Memphis Estate

42.     Plaintiffs are informed and believe and thereon allege that on or about December 30, 2010, Saxon informed Plaintiffs that he was willing to sell his Memphis ranch, if necessary, to repay Plaintiffs. Plaintiff Barbour ran a title search of the Memphis property and learned that neither Saxon nor any of his related entities owned the house; instead, it was and is owned by the Michael L. Miller Revocable Trust, the entity that holds it for a well-known NBA athlete. The property records do not reflect any recent sale or transaction involving the property. A true and correct copy of the title report is attached to this Complaint as Exhibit "I" and is incorporated herein by reference. Instead, Plaintiffs are informed and believe that Saxon leases the property from the Miller Trust, and

10

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED; BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

1  does not own it.  Defendant Saxon's representations were and are false, and designed to cause

2  Plaintiffs' to forbear and delay in pursuing their legal remedies.

3  **Distribution of the "Minkow" Movie**

4  43.  Plaintiffs are informed and believe and thereon allege that on or about January 3,

5  2011, Defendant Saxon informed Plaintiff Barbour that his film "Minkow" was ready to be sold; that

6  Saxon would use the proceeds to repay Barbour; and that he had an offer of $2.5 million from Sony

7  Pictures to distribute the "Minkow" film.

8  44.  Plaintiffs are informed and believe and thereon allege that the true facts were that at

9  the time that these representations were made by Saxon, Sony had already passed on the project, and

10  furthermore that any participation or rights in the project had been pledged to the Palmer House

11  orphanage in Memphis, Tennessee, as security for the monies Palmer House alleges Saxon

12  wrongfully took from them.

13  **The Palmer House Orphanage Film**

14  45.  Plaintiffs are informed and believe and thereon allege that on or about January 4,

15  2011, Plaintiff learned that the Palmer House orphanage had funded at least $750,000.00 to Saxon

16  and/or his entities for their filming of a movie that Saxon represented would be based on the

17  orphanage. According to representatives of the Palmer House, all of the monies that the orphanage

18  invested are missing and are believed to be taken by Saxon for other purposes.  The Palmer House

19  representatives have stated that they believe Saxon may have used some of their money to meet his

20  own investment obligation in the "Minkow" movie project, and that they have now obtained all of

21  Saxon's profit participation rights in that project in an attempt to get repaid the monies wrongfully

22  taken from them by Saxon.  Plaintiffs are informed and believe that Defendant Stein conspired and

23  collaborated with Saxon to divert the Palmer House monies to other purposes.

24  **Revenues from Re-distribution of "The Grand" Film**

25  46.  As further evidence of Saxon and IMG's continuing fraud, Plaintiffs are informed and

26  believe that Saxon's statements concerning revenues coming to him and his entities from various

27  films were false and deceptive.  Among other things, Saxon has purported to assign to various parties

28  the proceeds he contends are due to him and his business entities from the same film project, namely,

11

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

1  "The Grand" starring Woody Harrelson and Ray Romano.  Specifically, Plaintiffs are informed and

2  believe that Saxon has promised the proceeds of monies from the distribution of "The Grand" to:

3          (a)    Steve Zellers, an investor/partner (in IMG), and also a creditor (through

4  various loan agreements which Plaintiff believes total a minimum of $1,350,000) from at least July

5  2008; and

6          (b)    to Yarbrough Productions as part of Saxon's personal guaranty for their

7  investment of $1,500,000, which agreement was made in October 2009; and

8          (c)    to Borak Holdings or its affiliate or assignee, which is alleged to have

9  received at least a portion of $1,100,000.00 in domestic distribution revenue received from "The

10 Grand."  Plaintiffs allege that Saxon knew that he did not expect to receive any net sums from the

11 movie "The Grand," and that his promise of that film as collateral for repayment of the loans was

12 false and deceptive, and that Saxon knew it was false and deceptive at the time that such statements

13 were made.

### Ownership Rights/Funding of the "Minkow" Movie

15 47.    Saxon is involved in co-producing the "Minkow" movie, an autobiography about

16 Barry Minkow. Saxon has represented to numerous people that he will receive substantial revenues

17 from that movie.  Saxon has promised profits and rights to such revenues to various parties as a

18 source to repay their loans and investments.  Barry Minkow became famous first as an (apparently)

19 successful entrepreneur; Minkow became infamous when he was convicted of defrauding investors

20 of millions of dollars in a completely made-up façade of a business (ZZZ Best Carpets), and was

21 sentenced to federal prison for his crimes. Once out of prison, Minkow claimed to be "born again,"

22 started a church, and started a business (FDI) whose business purpose was to investigate and

23 publicize fraud and misleading public statements by corporations and their officers.  As before, FDI

24 and Minkow have received positive press for their activities, which purport to benefit regular

25 investors.  Minkow has profited from his activities by shorting the stocks of companies he and FDI

26 were investigating, which is itself a source of controversy and litigation by targets of FDI's efforts.

27  Recently, Minkow and FDI have been under investigation, and in December 2010 a Florida court

28 entered a default and sanctions against Minkow and FDI, finding that Minkow made numerous and

MARCUS, WATANABE
DAVE, LLP

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

1  repeated misrepresentations to the court, destroyed evidence, and otherwise made determination of

2  the truth of the underlying matter exorbitantly expensive for the adverse parties to investigate and

3  establish. A judgment was entered against Minkow and/or FDI, and FDI publicly apologized.  The

4  recent negative and adverse publicity may have a detrimental impact on the distribution of the film,

5  and on the revenues anticipated from the distribution of the film, which various creditors expect will

6  repay Saxon's obligations to them.

7       48.     Into this story waded Saxon.  Plaintiffs are informed and believe that Saxon partnered

8  up with Minkow to make a motion picture based on Minkow's life and activities, and persuaded

9  Minkow to fund a good portion of the movie as a co-producer, star, and investor.   Plaintiffs are

10  informed and believe and thereon allege that after Minkow and his group made their initial financial

11  contribution and loan, they suspected that Saxon was misappropriating funds and insisted on taking

12  over the banking and management of the movie finances.

13

14                          **FIRST CAUSE OF ACTION**

15                              **(For Fraud)**

16       49.     Plaintiff hereby repeats and realleges each and every allegation of Paragraphs 1

17  through 48, inclusive, as set forth above, with the same force and effect as if fully set forth herein.

18       50.     In order to induce Plaintiffs to loan Defendant and his entities $550,000.00,

19  Defendant Saxon continually and consistently misrepresented his financial position.  To wit:

20              (a)    He represented to Plaintiff that he was solvent.

21              (b)    He represented to Plaintiff that he had adequate assets in the form of (i) his

22  film projects, (ii) substantial cash investors from Egypt and other film projects, (iii) stock, (iv)

23  personal assets in real estate, (v) real estate holdings in Tennessee, and (vi) cash on hand, in order

24  to be able to easily repay Plaintiff the funds advanced.

25       51.     When Defendant Saxon made these representations to Barbour, he knew that they

26  were untrue, and yet he intended to, and did, induce Plaintiffs to rely on them.

27       52.     Because of Plaintiffs' relationship with Defendant Saxon, and Saxon's lavish

28  lifestyle, Plaintiffs had no reason to believe that Defendant was untruthful and that Defendant was

13

ARCUS, WATANABE
DAVE, LLP

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

1 | in fact insolvent.  Plaintiffs' reliance on Saxon's representations, because of the relationship with

2 | Barbour, were reasonable.

3 |     53.    The true facts surrounding Saxon's finances and representations were that:

4 |     (a)    The Defendants were out of funds and Saxon was personally insolvent;

5 |     (b)    The Defendant had already engaged in acts of fraud and misrepresentation to

6 | investors in Tennessee, Mississippi, and California including the Palmer House Orphanage (on a film

7 | that was never shot), Yarbrough Productions and Borak Holdings (on a film that was never shot),

8 | in order to obtain funds to keep operations running and to fund his extravagant personal lifestyle;

9 |     (c)    The Defendants had no significant sources of revenue, and Saxon's own

10 | partners and shareholders (including Los Angeles investor Steve Zellers) were making claims and

11 | demands on Saxon and Stein for monies due to them;

12 |     (d)    The Defendants did not own certain real property they represented was owned

13 | by them;

14 |     (e)    Projects that Defendants represented were being purchased by studios in fact

15 | had been rejected;

16 |     (f)    Defendant did not own significant stock or other securities with which to pay

17 | his debts;

18 |     (g)    Defendant Saxon converted investor funds and loans provided to him for

19 | business purposes to his own personal use, in breach of his fiduciary duties, his contractual

20 | obligations, and the common law.  Further, Defendants Saxon and Stein used monies obtained from

21 | Plaintiffs to make payments to other entities and enterprises, outside of the use of funds represented

22 | by Saxon.  Further, Plaintiffs are informed and believe that Saxon and Stein diverted monies

23 | intended for specific purposes by investors, lenders and creditors and used such funds not for their

24 | intended purpose to make the film as promised, but to pay other creditors unrelated to the particular

25 | project, in furtherance of the fraudulent enterprise.

26 |     54.    When the Defendants made these representations to the Plaintiffs, they did so with

27 | the knowledge that the Plaintiffs would reasonably rely on them to their detriment.

28 |

MARCUS, WATANABE
DAVE, LLP

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

55.   In acting as they did, Defendants acted fraudulently and as a result have subjected themselves to liability for exemplary damages.

## SECOND CAUSE OF ACTION

### (For Breach of Contract)

56.   Plaintiff hereby repeats and realleges each and every allegation of Paragraphs 1 through 55 inclusive, as set forth above, with the same force and effect as if fully set forth herein.

57.   Defendants have failed to repay Plaintiffs the $550,000.00 that was advanced to them on May 28, 2010, and on August 24, 2010, as well as the funds which they removed from Bank of America and transferred to their own accounts on or about August 3, 2010.

58.   Defendants acknowledged the debt and obligation to repay in writing, affirming that all said sums were due on or before September 1, 2010.  Plaintiffs have fully performed any portion of any contract they had with Defendants, but Defendants have breached it by failing to repay.

## THIRD CAUSE OF ACTION

### (For Money Had and Received)

59.   Plaintiff hereby repeats and realleges each and every allegation of Paragraphs 1 through 58, inclusive, as set forth above, with the same force and effect as if fully set forth herein.

60.   On or about May 28, 2010, August 3, 2010, and August 24, 2010, the Defendants became indebted to Plaintiffs in the sum of $550,000.00.  Defendants have failed to repay said sums despite the demand that they repay, and are liable for the full amount, plus interest at the statutory rate, to Plaintiffs.

## FOURTH CAUSE OF ACTION

### (For Breach of Contract/Monies Due)

61.   Plaintiff hereby repeats and realleges each and every allegation of Paragraphs 1 through 47, inclusive, as set forth above, with the same force and effect as if fully set forth herein.

62.   Since at least May 2010, Defendants have received revenues as a result of Plaintiff Barbour's efforts pursuant to Barbour's agreement to solicit clients for TMP and for Saxon. Defendants have taken, and continue to take, such funds without meeting their obligation to pay Barbour his commissions due.

15

ARCUS, WATANABE
DAVE, LLP

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

63.     Barbour has made repeated demands for the monies due to him and for an accounting, to no avail.  Defendants have failed and refused to pay Barbour said sums, which Plaintiff alleges to be in the amount of at least $60,372.

64.     Plaintiff is informed and believes that the monies received by Defendants were converted to improper uses for other business enterprises other than TMP, and Plaintiff is informed and believes that such monies were, in whole or in part, converted to personal use by Saxon.

## FIFTH CAUSE OF ACTION

### (For RICO Violations, 18 U.S.C. § 1961, et seq.)

65.     Plaintiff hereby repeats and realleges each and every allegation of Paragraphs 1 through 60 inclusive, as set forth above, with the same force and effect as if fully set forth herein.

66.     Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, committed fraud via Internet communications, facsimile transmissions, telephone conversations, mail fraud, and wire transfers occurring in interstate commerce, and otherwise defrauded the Barbour Plaintiffs, including but not limited to those allegations set forth in Paragraphs 1 to 60 above.  Plaintiffs also are informed and believe and thereon allege that Defendants threatened and intimidated creditors and witnesses in order to coerce their silence and prevent them from disclosing unlawful and/or fraudulent acts.

67.     The acts of Defendants and their co-conspirators as described above against Plaintiffs and others have the same or similar purposes, results, participants, victims, or methods of commission, and are otherwise interrelated by distinguishing characteristics and are therefore not isolated events.

68.     The acts of Defendants and their co-conspirators as described throughout this Complaint amount to or pose a threat of continued and/or ongoing criminal activity.

69.     The acts of Defendants and their co-conspirators, including the acts of wire fraud (18 U.S.C. § 1343) and mail fraud were a regular way of conducting the ongoing business of Defendants and their co-conspirators.  Plaintiffs are informed and believe that the Barbour Plaintiffs, the Yarbrough Productions plaintiffs, Scott Zellers, the Palmer House, Borak Holdings, and others were deceived by the acts of Defendants and their co-conspirators.

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

70.     Defendants, and each of them, are entities capable of holding legal or beneficial interests in property and, as such, are subject to the RICO Act pursuant to 18 U.S.C. § 1961(3).

71.     During all relevant times, Saxon, Stein, Conduit, and other entities unknown to Plaintiffs were and are part of an "enterprise" as the term is defined in 18 U.S.C. § 1961(4), having a common or shared purpose, functioning as a continuing unit, engaged in interstate commerce and the activities of which affect interstate commerce, and which has an ascertainable structure distinct from that which is inherent in the conduct of the pattern of racketeering. Plaintiffs are informed and believe that Saxon and/or Stein established numerous subsidiaries or affiliates of IMG, in order to effect the enterprise and deceive investors and creditors. Plaintiffs are informed and believe that Saxon and/or Stein may have used IMG and/or Conduit to effect the enterprise and deceive investors and creditors.

72.     The wire fraud and mail fraud perpetrated by Defendants as alleged above constitutes a pattern of racketeering activity consisting of two or more acts or racketeering activity, one of which occurred after the effective date of 18 U.S.C. §1961, et seq., and the last of which occurred within ten years after the commission of a prior act of racketeering activity. Such acts include, but are not limited to, the acts set forth in Paragraphs 11, 15 to 54, and 60 to 72, above.

73.     Plaintiffs are informed and believe, and on that basis allege, that at all relevant times Saxon, Stein and/or IMG invested and/or used income derived, either directly or indirectly, from the above-described pattern of racketeering activity in the establishment and/or operation of an enterprise, namely IMG or Conduit, which engaged in and/or whose activities affected interstate commerce, in violation of 18 U.S.C. § 1962(a).

74.     Plaintiffs are informed and believe, and on that basis allege, that at all relevant times, in undertaking the actions described herein, Saxon, Stein, and/or IMG and Conduit, through a pattern of racketeering activity, directly or indirectly acquired and maintained an interest in and control over an enterprise which engaged in and/or whose activities affected interstate commerce, in violation of 18 U.S.C. § 1962(b).

75.     Plaintiffs are informed and believe, and on that basis allege, that at all relevant times, in undertaking the actions described herein, IMG and/or Conduit and its officers and employees were

17

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

1    associated with an enterprise the activities of which affect interstate commerce, and conducted and

2    participated, directly or indirectly, in the conduct of the affairs of the enterprise through the above-

3    described pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

4         76.    Plaintiffs are informed and believe, and on that basis allege, that Saxon and IMG

5    and/or Conduit and its officers and employees, and each of them, conspired with each other and with

6    third parties, including but not limited to TMP, Set in Space, and Stein to perpetrate the above-

7    described pattern of racketeering in violation of 18 U.S.C. § 1961(d).

8         77.    As the direct and proximate result of the foregoing violations of 18 U.S.C. § 1962 by

9    Defendants, Plaintiffs have sustained injury to their property and to their business.  Plaintiffs are

10    entitled to recover treble damages, costs of suit, and attorney's fees in accordance with 18 U.S.C.

11    § 1964(c), as Congress has authorized private party enforcement of the RICO statute and

12    reimbursement of attorney's fees expended therein.

13                             **PRAYER FOR RELIEF**

14         WHEREFORE, Plaintiffs pray for judgment as follows:

15    **On the First Cause of Action for Fraud:**

16         1.      That judgment be had against Defendants for at least $550,000.00;

17         2.      For exemplary damages;

18         3       For reasonable attorneys' fees;

19         4.      For costs of suit herein incurred; and,

20         5.      For such other and further relief as the Court may deem proper.

21    **On the Second Cause of Action for Breach of Contract:**

22         1.      For an award against Defendants in the total sum of $550,000.00 in principal, interest,

23    fees, and other charges detailed on Exhibit A, together plus interest at the legal rate of $150.68  per

24    day from September 1, 2010, to the date of entry of judgment;

25         2.      For reasonable attorneys' fees;

26         3       For costs of suit herein incurred; and,

27         4.      For such other and further relief as the Court may deem proper.

28

MARCUS, WATANABE
& DAVE, LLP

**On the Third Cause of Action for Money Had and Received:**

1.     For judgment in the amount of $550,000.00;

2.     For interest at the legal rate of $150.68 per day from September 1, 2010, to the date of entry of judgment, and at the same legal rate until such judgment is satisfied in full by Defendants;

3.     For reasonable attorneys' fees;

**On the Fourth Cause of Action for Breach of Contract (Commissions Due):**

1.     For an award of monies due in the amount of at least $60,372 plus interest, fees, and other charges from the date of each payment due, and other and further sums due from revenues received;

2.     For attorneys' fees and costs;

3.     For an accounting;

4.     For costs of suit incurred herein;

5.     For such other and further relief as the Court may deem just and proper.

**On the Fifth Cause of Action for Criminal Conduct in Violation of RICO for Civil Damages:**

1.     For an award of monies due in the amount of $550,000.00, plus interest, fees, and other charges in an amount to be proved at trial, plus legal interest at the rate of $150.68 per day from September 1, 2011, until the date of entry of judgment;

2.     For an award of treble damages for violations of 18 U.S.C. § 1962;

3.     For punitive and exemplary damages;

4.     For attorneys' fees as provided by law (including but not limited to 18 U.S.C. § 1964(c) according to proof at the time of trial;

5.     For interest according to proof at trial;

MARCUS, WATANABE DAVE, LLP

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED; BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

1    6.    For the costs of suit herein incurred;

2    7.    For such other and further relief as the Court deems just and proper;

3

4    DATED:  February 4, 2011         BURKE & ASSOCIATES

5

6                    By:

7                    MICHAEL KERRY BURKE
                      SCOTT BARBOUR, individually, and ZB FAMILY

8                    TRUST, SCOTT BARBOUR, Trustee

9                    And

10                   DAVID M. MARCUS
                   MARCUS, WATANABE & DAVE, LLP

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARCUS, WATANABE
DAVE, LLP

COMPLAINT FOR: 1) FRAUD; 2) BREACH OF CONTRACT; 3) MONEY HAD AND RECEIVED;
BREACH OF CONTRACT (COMMISSIONS DUE); RICO CONSPIRACY

**EXHIBIT A**

**Barbour's next Check**

| | | | |
|---|---|---|---|
| Allstate - April | 15,000.00 | 20% | $3,000.00 |
| Vcut - June | 10,000.00 | 20% | $2,000.00 |
| 5W Public Relations - June | 750.00 | 50% | $375.00 |
| E&M Advertising- June | 15,000.00 | 40% | $6,000.00 |
| Allstate - May | 15,000.00 | 20% | $3,000.00 |
| Giovanni - June | 7,500.00 | 20% | $1,500.00 |
| Vcut - July | 10,000.00 | 20% | $2,000.00 |
| Giovanni - July | 7,500.00 | 20% | $1,500.00 |
| Vcut - August | 10,000.00 | 20% | $2,000.00 |
| E&M Advertising - July | 15,000.00 | 40% | $6,000.00 |
| Allstate - June | 15,000.00 | 20% | $3,000.00 |
| E&M Advertising - Aug | 15,000.00 | 40% | $6,000.00 |
| Allstate - July | 15,000.00 | 20% | $3,000.00 |
| Vcut - September | 10,000.00 | 20% | $2,000.00 |
| Giovanni - August | 3,750.00 | 20% | $750.00 |
| E&M Advertising - Sept | 15,000.00 | 40% | $6,000.00 |
| Vcut - October | 10,000.00 | 20% | $2,000.00 |
| E&M Advertising - October | 15,000.00 | 40% | $6,000.00 |
| Classic Slipcovers - August | 5,000.00 | 40% | $2,000.00 |
| Giovanni - September | 3,750.00 | 20% | $750.00 |
| Classic Slipcovers - September | 5,000.00 | 40% | $2,000.00 |
| Giovanni - October | 3,750.00 | 20% | $750.00 |
| Classic Slipcovers - October | 5,000.00 | 40% | $2,000.00 |
| E&M Advertising - November | 15,000.00 | 40% | $6,000.00 |
| Giovanni - November | 3,750.00 | 20% | $750.00 |
| Vcut - November | 10,000.00 | 20% | $2,000.00 |
| Classic Slipcovers - November | 5,000.00 | 40% | $2,000.00 |
| E&M Advertising - December | 7,500.00 | 40% | $3,000.00 |
| Giovanni - December | 3,750.00 | 20% | $750.00 |
| Vcut - December | 10,000.00 | 20% | $2,000.00 |

$80,125.00

Less - Payroll - 8/15, 8/31, 9/15,
9/30, 10/15, 10/31, 11/15, 11/30,
12/15, 12/31
Less - Payroll Taxes - 8/15, 8/31,
9/15, 9/30, 10/15, 10/31, 11/15,
11/30, 12/15, 12/31
Less - July Blue Cross (balance for
rate increase)
Less - Aug. - January Blue Cross

Net Check                    $80,372.00

**EXHIBIT  B**

Bank of America | Online Banking | Transaction Image Print                    Page 1 of 1

**Checking - 4682 : Transaction Details**

**Transaction Details:**

| | |
|---:|:---|
| **Description:** | Check 2026 |
| **Posting date:** | 05/28/2010 |
| **Amount:** | $150,000.00 |
| **Type:** | Check |
| **Account number:** | Checking-4682 |

**Please Note:** Only items posted to your account within the newest 180 calendar days will be available online.

**Additional Details:**

**My Description:**

**EXHIBIT C**

FILED
WILLIAMSON COUNTY
CLERK & MASTER

**CHANCERY COURT OF TENNESSEE**
**21st JUDICIAL DISTRICT**
**WILLIAMSON COUNTY** 2010 FEB -9  PM 12: 09

| | |
|---|---|
| Yarbrough Production Company, LLC, | **JURY TRIAL DEMANDED** |
| Plaintiff, | Case No.  37602 |
| V. | **VERIFIED** |
| Bret Saxon; Set in Space, Inc.; and IMG Film, Inc. | **COMPLAINT** |
| Defendants. | |

Plaintiff, Yarbrough Production Company, LLC ("YPC"), complaining of Defendants Bret Saxon ("Saxon"); Set in Space, Inc. ("Set in Space"); and IMG Film, Inc. ("IMG") [collectively Defendants], alleges herein:

## PARTIES

1.      YPC is a limited liability corporation organized and operating under the laws of Delaware and does business in Williamson County, Tennessee.

2.      Saxon is a resident of California and serves as the Chairman of the Board, President, Treasurer, and Secretary of Set in Space and IMG.

3.      Set in Space is a corporation organized and operating under the laws of California with its principal place of business at 3340 Ocean Park Boulevard, Suite 3050, Santa Monica, California 90405.

4.      IMG is a corporation organized and operating under the laws of California with its principal place of business at 3435 Ocean Park Boulevard, Suite 107, Santa Monica, California 90405.

## JURISDICTION

5.      This Court has personal jurisdiction over the parties.  Plaintiff YPC maintains its principal place of business in Tennessee.  Defendant Saxon transacted business in Tennessee and has entered into contracts to be performed in whole or in part in Tennessee.  Defendants Set in Space and IMG are foreign corporations engaged in business transactions within Tennessee and have entered into contracts to be performed in whole or in part in Tennessee.  *See* Tenn. Code Ann. §§ 20-2-201; 2-222; 3-223 (West 2010). Furthermore, Defendants have expressly agreed to submit to the jurisdiction of this Court.

6.      This Court has subject matter jurisdiction over this matter as it involves a business dispute arising out of an agreement to finance the production of a movie in Tennessee between YPC with its principal place of business in Tennessee and Defendants. The amount in controversy exceeds $1.5 million.

## VENUE

7.      Venue is appropriate in Williamson County because it is the county in which the financing agreement was executed, where the majority of negotiations have taken place, and where the cause of action arose. *See* Tenn. Code. Ann § 16-11-114 (West 2010).

## FACTS

8.      YPC entered into a financing agreement (the "Agreement") dated October 6, 2009 with Defendants Set in Space and IMG in connection with financing the production of a movie (the "Picture"). A true and accurate copy of the Agreement is attached hereto as Exhibit 1.

9.      Pursuant to the terms of the Agreement, YPC and IMG agreed to invest one and half million (1,500,000) dollars and three a half million (3,500,000) dollars respectively (the "Combined Financing") to fund production of the Picture by Set in Space.

10.    This Combined Financing was to be advanced and deposited in Bank of America account #23547-69-789 (the "Picture Account") controlled by YPC.

11.    As stated in the Agreement, funds placed in the Picture Account were to be held in trust for the party investing the money until one hundred (100) percent of the Combined Financing, or five million (5,000,000) dollars, had been received in the Picture Account.

12.    Within ten (10) days of wiring investment funds into the Picture Account, Set in Space was required to provide evidence of a deposit balance of five million (5,000,000) dollars in the Picture Account to YPC and IMG.

13.    Additionally, Set in Space was prohibited from utilizing any of the money in the Picture Account until one hundred (100) percent of the Combined Financing had been received in the account.

14.    To secure compliance with the Agreement, Saxon, individually, and IMG signed a guaranty in favor of YPC (the "Guaranty") dated October 6, 2009.

15.    Pursuant to the Guaranty, Saxon and IMG jointly and severally guaranteed payment to YPC of all payments due by Set in Space and performance of all obligations under the Agreement.

16.    As security for the obligations of Saxon and IMG outlined in the Guaranty, Saxon pledged to YPC his membership interest in IMG Film 7, LLC (the "Collateral") - an entity holding all rights and title to the motion picture entitled "The Grand" starring Woody Harrelson and others.

17.    On October 21, 2009 YPC wired its portion of the Combined Financing, one and half million (1,500,000) dollars, to the Picture Account.

18.    Thereafter, YPC made numerous requests for proof of funding from Set in Space.

19.     Set in Space repeatedly assured YPC that IMG deposited the required three and half million (3,500,000) dollars in the Picture Account but failed to provide YPC with documentation supporting this representation.

20.     On January 25, 2010, YPC again requested proof of funding.

21.     In response to this request, Set in Space sent YPC statements it alleged showed that the three and half million (3,500,000) dollars had been deposited with YPC.

22.     Notably, the statements provided were from accounts not known to YPC or approved by YPC in the Agreement, rather than a statement from the Picture Account.

23.     Additionally, the statements did not provide evidence that IMG had deposited its portion of the Combined Financing.

24.     Rather, the statements indicate Set in Space transferred a portion of YPC's one and half million (1,500,000) dollars through several unauthorized accounts to give the appearance that a portion of IMG's three and half million (3,500,000) dollar funding had been received.

25.     Despite the failure of Set in Space to provide evidence that one hundred (100) percent of the Combined Financing had been received, Set in Space began production of the Picture in violation of the Agreement terms.

26.     Additionally, Set in Space repeatedly failed to provide YPC with production schedules as required by the Agreement.

27.     On February 26, 2010 YPC and Saxon met to discuss the failure of Set in Space to provide evidence of funding and production schedules.

28.    During the meeting, the parties agreed Saxon would provide documentation evidencing IMG's payment of its portion of the Combined Financing between October 21, 2009 and October 31, 2009 to YPC on Monday February 8, 2010.

29.    YPC never received documentation from Set in Space evidencing that the total deposits in the Picture Account totaled five million (5,000,000) dollars during the time period required by the Agreement.

## FIRST CAUSE OF ACTION
### (Breach of Contract- Set in Space & IMG)

30.    Each and every allegation contained in the preceding paragraphs is reiterated as if set forth verbatim herein.

31.    YPC, IMG, and Set in Space entered into the Agreement for the purpose of funding the Picture.

32.    Pursuant to its obligation under the Agreement, YPC paid one and half million (1,500,000) dollars into the Picture Account.

33.    In breach of the Agreement, IMG failed to deposit its portion of the Combined Financing of three and half million (3,500,000) dollars into the Picture Account.

34.    In breach of the Agreement, Set in Space failed to provide YPC with evidence that the total balance of deposits between October 21, 2009 and October 31, 2009 totaled five million (5,000,000) dollars.

35.    In violation of the Agreement, Set in Space began production of the Picture prior to receiving one hundred (100) percent of the Combined Financing in the Picture Account.

36.    Additionally, Set in Space failed to provide YPC with required production schedules.

37.     As a result of the breach by Set in Space and IMG, YPC suffered monetary damages.

38.     YPC is therefore entitled to an award of actual damages caused by Defendants Set In Space and IMG's breach of contract.

## SECOND CAUSE OF ACTION
### (Fraud- Set in Space & IMG)

39.     Each and every allegation contained in the preceding paragraphs is reiterated as if set forth verbatim herein.

40.     Set in Space and IMG, through their agent Saxon, informed YPC through oral and written communication and bank documentation that IMG had paid, and Set in Space had received, one hundred (100) percent of the Combined Financing as required by the Agreement [collectively the "Representations"].

41.     The Representations were material and made intentionally by Set in Space and IMG to YPC.

42.     Set in Space and IMG made the Representations knowingly and recklessly, without belief of their truth and with knowledge of their falsity.

43.     The Representations were made by Set in Space and IMG on numerous occasions and related to a past fact – the account balance of the Picture Account during October 21, 2009-October 31, 2009.

44.     YPC reasonably relied on the Representations and has suffered damage as YPC's money is being utilized contrary to the terms of the Agreement.

45.     YPC is therefore entitled to an award of actual and punitive damages resulting from Defendants Set in Space and IMG's fraudulent conduct.

## THIRD CAUSE OF ACTION
### (Fraud in the Inducement- Saxon, Set in Space & IMG)

46.     Each and every allegation contained in the preceding paragraphs is reiterated as if set forth verbatim herein.

47.     Saxon, as agent for Set in Space and IMG, intentionally misrepresented to YPC that IMG would deposit the required three and half million dollars in financing into the Picture account and that Set in Space would hold YPC's money in trust until one hundred (100) percent of the Combined Financing had been received [collectively the "Misrepresentations"].

48.     The Misrepresentations related to material facts surrounding the financing terms in the Agreement.

49.     Saxon, Set in Space and IMG made these Misrepresentations to YPC with no intention of performing these promises in the future.

50.     YPC has been injured.  In reasonably relying on the Misrepresentations of Set in Space and IMG, YPC entered into the Agreement and wired one and half million dollars into the Picture Account.

51.     YPC is therefore entitled to an order of judgment against Defendants allowing YPC to rescind the Agreement, return of the consideration paid by YPC, plus pre-judgment interest and compensatory and punitive damages.

## FOURTH CAUSE OF ACTION
### (Enforcement of the Guaranty - Saxon & IMG)

52.     Each and every allegation contained in the preceding paragraphs is reiterated as if set forth verbatim herein.

53.     Saxon and IMG entered into the Guaranty whereby these Defendants were jointly and severally liable for the performance of all obligations and payment of all amounts payable under the Agreement.

54.     YPC fulfilled its duties under the Agreement by depositing one and half million (1,500,000) dollars in the Picture Account.

55.     IMG failed to deposit its required monetary contribution under the Agreement.

56.     Set in Space failed to provide YPC with documentation of its receipt of one hundred (100) percent of the Combined Financing, prematurely began production of the Picture, and failed to provide YPC with production schedules.

57.     Defendants directly and materially benefited from YPC's monetary investment without fulfilling their respective obligations under the Agreement.

58.     Accordingly, YPC is entitled to enforcement of the Guaranty and to the Collateral pledged as security in the Guaranty.

## FIFTH CAUSE OF ACTION

### (Breach of Trust-Saxon, Set in Space and IMG)

59.     Each and every allegation contained in the preceding paragraphs is reiterated as if set forth verbatim herein.

60.     Defendants Saxon, Set in Space and IMG agreed to hold YPC's deposit of One Million and Five Hundred Thousand ($1,500,000.00) Dollars in trust until such time as IMG deposited Three Million and Five Hundred Thousand ($3,500,000.00) into the Picture Account.

61.     Under the terms of the Agreement, Defendants were prohibited from utilizing any of the money in the Picture Account until one hundred (100) percent of the Combined Financing had been received in the account.

62.    Defendants violated the terms of the trust agreement by withdrawing YPC's One Million and Five Hundred Thousand ($1,500,000.00) from the Picture Account before the account was fully funded and have used and continue to use Plaintiff YPC's money in violation of the trust agreement.

63.    Defendants by their conduct have violated Tennessee Code of Laws Section 35-15-101 et. seq,

64.    Plaintiff YPC is therefore entitled to all available equitable remedies provided in Tennessee Code Section 35-15-1001 to include a temporary restraining order; a temporary and permanent injunction prohibiting Defendants from continuing the breach of trust; an order allowing YPC or its designee immediate examination of all the books and records of Defendants showing the use of YPC's money; the appointment of a special fiduciary to take possession of YPC's remaining funds; an order requiring Defendants to restore the full amount of YPC's deposit, and to pay YPC its costs and attorneys fees incurred in this action.

65.    Plaintiff YPC is further entitled to an award of compensatory damages as provided in Tennessee Code Section 35-15-1002 in the amount required to restore the value of the trust property and trust distributions to what they would have been if the breach had not occurred or the profits made by Defendants as a result of the breach, whichever is greater.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants providing Plaintiff with the following relief:

a) Rescission of the Agreement based on the fraudulent behavior of Saxon, Set in Space and IMG;

b) Repayment by Defendants to Plaintiff of one and half million (1,500,000) dollars, Plaintiff's total investment, plus pre-judgment interest;

c) Punitive damages in an amount adequate to punish the Defendants for their fraudulent behavior and sufficient to deter the Defendants and others from similar conduct in the future;

d) Enforcement of the Guaranty;

e) Entry of preliminary and permanent injunctive relief restraining Defendants from continuing to breach the trust agreement with Plaintiff YPC and ordering Defendants to restore all funds distributed from the trust to YPC;

f) An Order Appointing a Special Fiduciary to take possession of all of Set In Space's remaining funds;

g) Pre-judgment and post judgment interest;

h) An Order requiring Defendants to allow Plaintiff YPC or its designee to immediately examine the books and records of Defendants showing Defendants' use of YPC's funds;

i) Attorneys fees and costs; and

j) Such other relief as the Court deems just and proper.

JURY TRIAL DEMANDED

Respectfully submitted,

Todd McTavish, Esq.
TN Bar No: 026107
Video Gaming Technologies, Inc.
155 Franklin Road, Ste. 255
Brentwood, TN 37027
Tel.: (615) 372-1029
Fax: (877) 256-4304
www.VGT.net

Attorney for Plaintiff Yarbrough Production
Company, LLC.

February 9, 2010

Of Counsel:

Richard A. Harpootlian,
P.O. Box 1090
Columbia, SC  29202
(803) 252-4848

James M Griffin
Margaret N. Fox
GRIFFIN LLC
P.O. Box 999
Columbia, SC  29202
(803) 744-0800

Set in Space, Inc,
3340 Ocean Park Boulevard, Suite 3050
Santa Monica, CA 90405
Attn: Bret Saxon

IMG Film, Incorporated
3435 Ocean Park Boulevard, Suite 107
Santa Monica, CA 90405
Attn: Bret Saxon

Yarbrough Production Company, LLC
155 Franklin Road, Suite 255
Brentwood, TN 37027
Attn: Jon Yarbrough, Jr.

October 6, 2009

Re: "FANDANGO" FINANCING

Ladies and Gentlemen:

This letter constitutes the agreement (the "Agreement") between Set in Space, Inc., a California corporation ("Producer"), IMG Film, Incorporated, a California corporation ("IMG") and Yarbrough Production Company, LLC, a Delaware limited liability company ("YPC," and collectively with IMG, the "Investors" and each individually an "Investor") in connection with certain investment financing undertaken by Investors regarding the motion picture project tentatively entitled "Fandango" (the "Picture") being produced by Producer.

1.      Financing.

        (a)      Producer hereby acknowledges and agrees to the following:

                (i)      that, as between the Producer and Investors, Producer will be responsible for the development, production, distribution, marketing, advertising, sales and exploitation of the Picture in accordance with the Approved Screenplay, Approved Budget and Approved Schedule (as such terms are defined below);

                (ii)      that Producer shall produce and complete the Picture and shall utilize the "Combined Financing" (as that term is defined below) to fund 100% of the production costs including, without limitation, customary delivery costs, in accordance with the Approved Budget;

        (b)      Each of IMG and YPC severally hereby agrees to make an equity investment in the Picture in the amount of $3,500,000 and $1,500,000 respectively (each such equity investment, a "Financing") for an aggregate total by all Investors hereunder of $5,000,000 ("Combined Financing") on the following terms and conditions:

                (i)      Subject to the terms hereof, each Investor shall provide such Investor's Financing upon the complete execution of this Agreement.

                (ii)      All Financing advances shall be advanced directly to Bank of America, ABA #: 026009593, and Account #: 23457-69789 (the "Picture Account"), or such other bank account approved

Fandango Financing Agreement (10-6-2009).doc

Page 1 of 18

by Investors. The Picture Account shall be a segregated account and may only be used to receive Financing advances and sums solely to fund production costs of the Picture in accordance with this Agreement, and Producer may not withdraw or otherwise use such monies for any other purpose. Any funds advanced to the Picture Account by an Investor shall be held in trust for such Investor until 100% of the Combined Financing has been received into the Picture Account. Producer shall not be entitled to utilize any of the Combined Financing until 100% of the Combined Financing has actually been received into the Picture Account. Within ten (10) days after the date of this Agreement, Producer shall provide each Investor with evidence of receipt of 100% of the Combined Financing into the Picture Account ("Funding Evidence"), which shall be in a form and substance satisfactory to each Investor, in each Investor's sole discretion. If any Investor has not received Funding Evidence within ten (10) days after the date of this Agreement, then Producer shall return all funded portions of the Combined Financing to the relevant Investors.

        (iii)    Producer shall not enter into any document or agreement that provides for, nor shall Producer enable, a third party to receive any gross revenue participation or return on investment in connection with the Picture prior to the payment of monies to Investor as set forth in Paragraph 2 hereof.

        (iv)    An Investor may in its discretion withhold funding of any Financing in the event that the Producer is in breach of this agreement.

        (c)    For the avoidance of doubt, no Investor shall have any obligation to further finance any costs in excess of such Investor's Financing.

        (d)    Without Investors' prior written consent, Producer may not raise further funds for completion of the Picture in addition to the Combined Financing unless such additional funds are either (A) non-recoupable, or (B) recoupable solely from Producer's Net Receipts (as defined below).

        (e)    For the avoidance of doubt, all third party participations and all deferments (except as set forth in Paragraph 2(e)) shall be paid from the Producer's Net Receipts (as defined below), and shall not reduce any Investor's participation in Investor's Net Receipts (as defined below).

2.    **Payment.**  Producer agrees to repay to each Investor such Investor's pro rata share of the Combined Financing, together with a twenty-five (25%) premium thereon, from Gross Receipts (if any) in accordance with this Paragraph 2. "Gross Receipts" shall mean all sums derived by Producer from the distribution, exhibition, and other exploitation of the Picture, and any merchandising, publishing, soundtrack, and other allied and/or ancillary rights relating thereto. Gross Receipts, if any, of the Picture shall be allocated in the following order:

        (a)    First, to the payment of ongoing actual, third party, out-of-pocket accounting costs and expenses incurred by Producer in connection with the processing of payments to profit participants; actual, third party, out-of-pocket payments by Producer of residuals to the extent such residuals are not assumed by the distributors of the Picture; and any amounts required to be withheld by law;

        (b)    Second, to the payment of any actual, third party, out-of-pocket sales fees, sales expenses and legal fees payable to the sales agents and distribution attorneys engaged with respect to the sale of the Picture;

        (c)    Third, to each Investor pro rata pari passu in accordance with their respective investments, until each Investor has received one hundred twenty-five percent (125%) of such Investor's Financing, if ever;

(d)     Fourth, to the payment of expenses approved by each Investor, in an aggregate amount not to exceed $500,000 in connection with the (i) ongoing ownership of the Picture (e.g., costs incurred in connection with the preservation and storage of negatives and master prints of the Picture) and (ii) the sales, marketing, promotion and publicity of the Picture;

(e)     Fifth, to the payment of actual deferrals approved by each Investor in an amount not to exceed $20,000;

(f)     Thereafter to Net Receipts. "Net Receipts" shall mean one hundred percent (100%) of all Gross Receipts remaining after the payments of all amounts set forth in Paragraph 2(a), 2(b), 2(c), 2(d) and 2(e) above. Producer shall receive fifty percent (50%) of Net Receipts ("Producer's Net Receipts"), and the other fifty percent (50%) of Net Receipts shall be "Investor's Net Receipts". Each Investor shall receive such percentage of Investors' Net Receipts equal to the percentage that such Investor's Financing advanced to the Producer represents of the Combined Financing.

(g)     Calculation and payment of Gross Receipts:

(i)     Producer shall render to each Investor accounting statements ("Accounting Statements") showing in reasonable detail the total amount of Gross Receipts, the source thereof, and all deductions, expenses and recoupment therefrom, and all sums due to such Investor, if any.   An Accounting Statement and any payment due shall be rendered within thirty (30) days after the end of each semi-annual period for the first two (2) years after the initial public commercial exhibition or commercial broadcast of the Picture and at the end of each annual period thereafter; provided, however, that no Accounting Statements need be rendered for any period in which no Gross Receipts are received by Producer; and

(ii)     All Gross Receipts shall be paid into a separate collection account that shall be maintained by a mutually selected collection agent (Lutz & Carr and Fintage are hereby approved) for the benefit of the parties pursuant to a collection agreement to be negotiated in good faith.  The collection agent shall make all required payments on behalf of the responsible parties in accordance with this Agreement to all persons or entities that have an interest in Gross Receipts or Net Receipts.  The parties acknowledge that the aforementioned duties of the collection agent shall not in any way relieve the parties of their respective obligations hereunder. Producer, IMG and YPC shall each have the right to receive copies of all accounting statements relating to the distribution and sale of the Picture and any proceeds derived therefrom and shall be entitled to customary audit rights with respect to all records relating to the Picture, provided that such audit rights shall be exercisable no more frequently than once per year and that any such audit shall be conducted during normal business hours upon reasonable notice.

3.     Equity, Election of Director.

(a)     In consideration of their investments hereunder, Producer agrees to issue to IMG and YPC that number of shares of Producer's Common Stock, $0.01 par value per share (the "Common Stock"), equal to 35% and 15%, respectively, of all of Producer's issued and outstanding shares of Common Stock, post issuance. Producer hereby represents and warrants that (i) the Common Stock is the authorized capital of Producer, (ii) the issued and outstanding shares of Common Stock immediately after the above issues have been duly authorized, are fully paid and nonassessable and have been issued in compliance with all applicable federal and state securities laws and (iii) any and all classes and series of shares of the Producer, or any part thereof, may be represented by uncertificated shares.

(b)     IMG agrees that until such time as all amounts owing YPC hereunder have been paid in full, it will upon the request of Jon Yarbrough Jr. elect him or his designee a director of Producer, or, if he

so chooses, permit him or his designee such access to Producer's books and records as he would have were he a director of Producer and, if he so chooses, permit him or his designee to attend all of Producer's board meetings.

4.     Guarantee Option.

(a)     YPC shall have the option (the "Guarantee Option") to receive the difference between one hundred twenty-five percent (125%) of its Financing and the aggregate amount of payments received to date by YPC pursuant to Paragraph 2 above (the "Guarantee Option Payment"). YPC may exercise the Guarantee Option on or at any time after the second anniversary of the date of this Agreement by providing Producer with written notice (the "Guarantee Option Notice"), pursuant to the terms of Paragraph 15, of its intent to exercise the Guarantee Option. Producer shall pay or cause to be paid to YPC the Guarantee Option Payment within seven (7) days after the deemed date of service under Paragraph 15 of the Guarantee Option Notice, by wire transfer to an account designated by YPC. After exercising the Guarantee Option, YPC shall no longer be entitled to any payments pursuant to Paragraph 2 and shall return to Producer any Producer's stock it then holds.

(b)     In order to induce YPC to enter into this Agreement and to make an investment hereunder and in recognition of the direct benefits to be received by IMG from YPC's investment hereunder, IMG hereby irrevocably and unconditionally guarantees to YPC the payment of the Guarantee Option Payment when the same shall be due and payable. IMG's guaranty hereunder is an irrevocable, absolute, continuing guaranty of payment. If all or any part of the Guarantee Option Payment shall not be paid by Producer when due, IMG shall, upon demand by YPC and without presentment, protest, notice of protest, notice of non-payment or any other notice whatsoever, pay the amount due on the Guarantee Option to YPC by wire transfer to the account designated by YPC in its demand. YPC need not prior to enforcing IMG's guarantee hereunder (i) exhaust YPC's remedies against Producer, (ii) enforce YPC's rights against any collateral held to secure YPC's Financing contribution or the Guarantee Option Payment or (iii) resort to any other means of obtaining payment of the Guarantee Option Payment.

(c)     IMG hereby agrees that its obligations under its guarantee hereunder shall not be released, impaired or adversely affected by any of the following and waives any rights which IMG might otherwise have as a result of or in connection with any of the following:

(i)     Any renewal or modification of all or any part of the Guarantee Option Payment or the Combined Financing,

(ii)     Any adjustment, forbearance or compromise granted by YPC to Producer or IMG, or

(iii)     The taking of any collateral or other guaranty, or other assurance of payment, for all or any part of the Guarantee Option Payment,

(d)     In the event IMG fails to timely perform its obligations to pay the Guarantee Option Payment, IMG shall upon demand by YPC pay YPC all costs and expenses (including court costs and attorneys' fees) incurred by YPC in the enforcement of YPC's rights under IMG's guarantee hereunder.

(e)     In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any decision thereunder, YPC is required to rescind or restore any payment or any part thereof received by IMG in satisfaction of the Guarantee Option Payment, any prior release or discharge from the terms of the guaranty given by YPC to IMG shall be without effect, and the guaranty hereunder shall remain in full force and effect.

(f)    The financial statements provided by IMG to YPC as of the date hereof (i) have been prepared from the books and records of IMG, (b) have been prepared in accordance with GAAP on a consistent basis throughout the indicated periods and (c) present fairly in all material respects the financial condition, results of operations, cash flow and shareholders' equity of IMG for the periods covered thereby and as of the respective dates thereof.  As of the date hereof, since the last day of the calendar year ended December 31, 2008, there has been no material change in the condition, financial or otherwise, of IMG, shown on the balance sheet as of such date and no change in the aggregate value of assets owned by IMG, except changes in the ordinary course of its business, none of which individually or in the aggregate has had a material adverse effect.

5.    **Ownership.**  Each of Producer, IMG and YPC shall own 50%, 35%, and 15%, respectively, of all right, title and interest in and to the Picture, and any and all elements thereto, including without limitation, worldwide copyright in the Picture, and in any and all elements thereto, including sequels, prequels, remakes and any and all other subsequent productions.

6.    **Consultation/Approvals.**

(a)    The Investors shall have approval (to be exercised in their reasonable discretion) over (i) the budget of the Picture ("Approved Budget"); provided that the budget attached as Exhibit "A" is approved, (ii) the screenplay for the Picture ("Approved Screenplay"); provided that the draft screenplay dated ___, 2009 is hereby approved; (iii) the production schedule for the Picture ("Approved Schedule"), provided that the draft thereof dated _____ is hereby approved, (iv) the director of the Picture ("Approved Director"); provided that Jonathan Meyers is hereby approved, and (v) the casting of horses in the Picture, which horses shall be true to the Paso Fino breed and obtained from and trained by reputable breeders and trainers, respectively, as applicable.  The Producer shall meaningfully consult with Investors prior to taking any actions to effect any material changes to the Approved Budget, the Approved Screenplay, the Approved Schedule or the Approved Director.

(b)    Investors shall have control of all business decisions relating to the Picture, provided that Investor shall meaningfully consult with Producer in connection with all material business decisions (including, without limitation, the engagement of sales agent(s) for the Picture and the distribution agreements for the Picture in all major territories).  In the event of a dispute between IMG and YPC on the one hand and Producer on the other hand concerning material business decisions, IMG and YPC's decision shall control.  In the event of a dispute between IMG and YPC concerning a business decision, the parties shall abide by the decision of a mutually approved sales agent.

(c)    Other than as provided in Paragraph 6(a) above and in this Paragraph, Producer shall have control of all creative decisions relating to the Picture; provided that Producer shall meaningfully consult with Investors in connection with all material creative decisions (including, without limitation, all cuts of the Picture) and Producer shall produce Picture in accordance with the Approved Screenplay, Approved Budget and Approved Schedule as changed in accordance with the last sentence of 6(a) above.  In the event of a dispute between Investors and Producer concerning such creative decisions, Producer's decision shall control.  Further, Producer shall be entitled to final cut of the Picture in all media worldwide.  Producer's right of final cut shall be subject to Investor's right to edit, cut, dub and make any changes in the Picture as they may deem necessary, but solely to meet (i) the Picture specifications set forth in Paragraph 8(b) below, (ii) censorship requirements of a bona fide governmental body, and (iii) bona fide litigation requirements, and Producer shall have the first opportunity to perform all cuts and edits required with respect thereto.  Notwithstanding the foregoing, in the event that the potential domestic distributor of the Picture requires as a condition of closing that the Picture be further edited, then (A) Producer shall be provided with the opportunity to discuss the requested cuts or edits directly with such

domestic distributor and (B) if after such discussions, the domestic distributor still requires cuts or edits to the Picture, then Producer shall have the first opportunity to make the required cuts or edits. Notwithstanding anything contained in the previous sentence, in the event that the Producer has screened the Picture for distributors and has been unable to secure sales of the Picture on terms that are acceptable to each Investor in its sole discretion, then IMG and YPC shall have the right to assume the final cut of the Picture (in meaningful consultation with Producer).

(d)     If the Producer does not begin pre-production of the Picture in accordance with the Approved Schedule and in any event before December 31, 2009, then each Investor shall have the option to demand the full amount of its Financing by providing Producer with written notice. Producer shall pay or cause to be paid to each Investor the full amount of its Financing by wire transfer within seven (7) days after receiving such notice.

7.     Production Reporting.  Investors or Investors' designees may attend all shooting on location and in any studio and otherwise enjoy complete and unfettered access to all stages of production and post-production at all times.  Producer will provide each Investor with daily production and "hot cost" reports and weekly cost statements on a timely basis.  Producer will also provide each Investor with: (i) dailies on videotape; and (ii) all "work in progress" film or video as may be requested by any Investor.  All previews and screenings of the Picture shall be subject to each Investor's prior written approval.

8.     Representations, Warranties, Undertakings and Indemnification.

(a)     Producer hereby represents and warrants that (i) Producer has the full right and authority to enter into this Agreement, (ii) Producer is duly formed and organized and validly existing in good standing under the laws of the jurisdiction of its organization, (iii) the consent of no other person or entity is necessary for Producer to enter into and fully perform this Agreement, and Producer has not made or assumed and will not hereafter make or assume any commitment, agreement or obligation that will or might (as reasonably foreseeable) conflict with or impair its ability to perform its obligations hereunder. (iv) the amounts for post-production in the Approved Budget is sufficient to complete delivery of the Picture to a distributor in accordance with the Delivery Requirements and the Approved Schedule, (v) every musical composition contained in the Picture will be licensed for use in and in connection with the Picture in perpetuity on a "flat buy-out basis", so that no payment of any kind shall be required (whether based on videocassette sales or otherwise) other than the one-time fixed fee provided in the applicable license and public performance fees, (vi) there is no claim, action, suit or proceeding relating to the Picture pending, or threatened, before any court, administrative or governmental body which might materially affect Investors' rights hereunder, (vii) there are no defects in the chain of title to the Picture, the Approved Screenplay or any other literary, musical or dramatic material upon which the Picture is based which would adversely affect any of Investors' rights hereunder and (viii) all materials which will be used in the Picture will be original with Producer, in minor part the public domain or licensed to Producer for use in the Picture by the parties which own or control such rights, and no part of the Picture nor the exhibition, distribution, exploitation or promotion thereof will violate or infringe upon any rights whatsoever of any person or entity (including, without limitation, any copyright or rights against libel, slander, defamation, invasion of privacy or unauthorized use of name, likeness or biography) and (ix) there are currently no liens on the Picture.

(b)     Producer undertakes that the Picture shall have a running time of not less than ninety (90) minutes, excluding titles and credits, nor more than one hundred and twenty (120) minutes, including titles and credits and shall qualify for an MPAA rating no more restrictive than "R", be predominantly in the English language and filmed on hi-definition video.

(c)     Producer undertakes that it shall (i) obtain, and cause all animal handlers involved in the filming of the Picture to obtain, all necessary federal, state, and local permits as well as any other licenses that may be required by law for all animals working in the Picture; (ii) obtain the American Humane Association's End Credit Disclaimer "No Animals Were Harmed"® (the "End Credit Disclaimer") and (iii) provide Investors with monthly updates regarding the measures taken to obtain the End Credit Disclaimer.

(d)     Producer undertakes that it shall use its commercially reasonable efforts to (i) give Investors prior notice of the times and locations of casting, location scouting and shooting and (ii) cast Investors or designees of Investors as extras in the Picture.

(e)     Producer shall indemnify, defend (at Investors' election), and hold harmless Investors and their respective officers, partners, agents, employees, affiliates and licensees from and against any and all claims, damages, liabilities, costs and expenses, including reasonable outside attorneys' fees and disbursements, arising out of: (i) any breach or, in the case of a third party claim, alleged breach, of any representation, warranty, covenant or agreement made by Producer herein; and (ii) development, production, exhibition, distribution, promotion and/or exploitation of the Picture and any element thereof by Producer or a third party.

(f)     Each Investor hereby represents and warrants that it has the full right and authority to enter into this Agreement and, where applicable, is duly formed and organized and validly existing in good standing under the laws of the jurisdiction of its organization.

(g)     Each Investor shall indemnify, defend and hold harmless Producer from and against any and all claims, damages, liabilities, costs and expenses, arising out of arising from its breach of any representation or warranty hereunder.

9.     Credit.   Each Investor shall be entitled to receive the following credit in connection with the Picture, as applicable:

(a)     Executive Producer: YPC shall be entitled to an executive producer credit, on a single card, in no less than 3rd position among all producer-type credits, substantially in the following form: "Executive Producer – Jim Yarbrough, Jr.", in the main titles. Such credit shall also appear in the billing block of paid advertising, videocassette and DVD packaging and one sheets for the Picture whenever a billing block appears and wherever any other producer or co-producer (as the case may be) receives credit (except nomination and award ads mentioning only the subject honoree). In no event shall the size or duration of such credit on screen or size of such credit in the billing block of paid advertising, video cassette and DVD packaging or one sheets be any smaller than the size or duration of the credit accorded to any other individual producer or co-producer (as the case may be) on screen or size of such credit in the billing block of paid advertising, video cassette and DVD packaging or one sheets, as applicable.

(b)     Presentation: To YPC, a presentation credit on screen, in the main titles in the following form: "Yarbrough Production Company, LLC" in an average size no less than 100% of the size of, and a duration on screen no less than that of, any other production company credit. Such credit shall also appear in the billing block of paid advertising, video cassette and DVD packaging and one sheets for the Picture whenever a billing block appears and wherever any other presentation or production company credit appears, in no less prominent position than the presentation credit of the Producer. YPC shall also receive its full-color logo on screen in the end title crawl at its own cost and expense.

Except for the foregoing, the size, color, shape, placement, duration and all other characteristics of said credits shall be at Producer's sole discretion. Producer shall contractually obligate all third-party

distributors to comply with the foregoing credit provisions. Upon receipt of notice of the failure to comply with the foregoing credit obligations, stating the nature of such non-compliance in reasonable detail, Producer shall use reasonable efforts to cure such failure prospectively.

10.    Security Interest.

    (a)    As security for repayment of One Hundred Twenty-Five Percent (125%) of the Combined Financing, for payment of Investors' share of Net Receipts in accordance with Paragraph 2 hereof and for payment of the Guarantee Option Payment, Producer hereby grants to each Investor a first priority security interest (the "Security Interest") in the "Collateral" (as hereafter defined), it being agreed that any action against the Collateral shall be taken by either Investor as it sees fit. For the purposes hereof, "Collateral" shall be defined as all of Producer's right, title and interest in and to the Picture and all allied, ancillary, subsidiary and derivative rights therein and all proceeds thereof, whether now in existence or hereafter made, acquired or produced, including without limitation, the following: (a) all of Producer's rights in and to the screenplay for the Picture and other literary or dramatic property upon which the Picture is based; (b) all of Producer's rights in the copyrights pertaining to the Picture and any renewals and extensions thereof; (c) the music of the Picture and all of Producer's rights therein; (d) all rights to distribute, lease, license, sell, exhibit, broadcast, or otherwise exploit the Picture in all media now known or hereafter devised, worldwide, in perpetuity; (e) all of Producer's contracts and contract rights, accounts, inventories and general intangibles relating to the Picture; (f) all physical properties of or relating to the Picture, including all exposed positive and negative film and pre-print elements and all sound tracks, and (g) all other proceeds of the foregoing rights, including all income and receipts derived from the marketing, distribution, licensing, sale and other exploitation of the Picture and all proceeds of insurance relating to the Picture.  The Security Interest as created hereunder shall commence as of the date hereof.  The parties agree to execute customary documentation in order to effectuate the Security Interest.  In the event Producer fails to execute any such documents within a reasonable amount of time, Producer hereby irrevocably appoints each Investor as its attorneys-in-fact with the full power to execute any and all documents as may be required in connection with the perfection of the Security Interest.  This appointment shall be a power coupled with an interest.  Investors shall provide Producer with a copy of such documents so executed, provided that the failure to do so shall not be a breach hereof.

11.    Miscellaneous.

    (a)    DVD:  Producer shall provide each Investor with one (1) DVD copy of the Picture each, promptly upon completion of the Picture, for such Investor's non-commercial use.

    (b)    Insurance:  Prior to the commencement of principal photography of the Picture, Producer shall obtain full customary production insurance (including, without limitation, general liability insurance and errors and omissions insurance with respect to the Picture, which policy shall have a coverage limit of no less than $2,000,000 USD per claim and $10,000,000 USD in the aggregate, with a deductible of no greater than $10,000 USD, subject to the limitations, restrictions and terms of said policy) and shall add each Investor as named insureds on such insurance policies.

    (c)    Premieres:  Producer shall provide (or shall use reasonable efforts to cause the relevant distributor to provide) each Investor with at least five (5) invitations each (each invitation for one person and a guest) to each premiere of the Picture and shall use reasonable good faith efforts to provide each Investor with at least five (5) invitations each (each invitation for one person and a guest) to a screening of the Picture at each major film festival in which the Picture is in competition.

(d)      Posters: Producer shall provide (or shall use reasonable efforts to cause the relevant distributor to provide) each Investor with one (1) each of the one-sheet sized poster created to promote the Picture, if any.

12.      **Right of First Refusal.**   As an inducement for YPC to enter into this Agreement, Producer grants to YPC (on behalf of its members) a right of first refusal to finance 100% of the budget for any sequel to the Picture ("Sequel") on the same terms as or better terms than the terms contained in this Agreement, provided, that, YPC shall not have a Guarantee Option in the financing of a Sequel; provided, further, that such right shall expire on the date that occurs sixty (60) days after the date on which Producer has provided YPC with all of the following with respect to such Sequel: a budget for the Sequel, a list of committed cast and creative talent, a screenplay and a production schedule.

13.      **Assignment.**   No party may assign this agreement without the other parties' prior written consent, provided, that each Investor may assign their respective rights to receive income hereunder, to no more than one third party, following written notice to Producer of such assignment(s).

14.      **Waiver of Injunctive Relief.**   Notwithstanding anything else to the contrary in this Agreement or any other agreement between or among any of the parties hereto, each of the parties hereby agrees for the benefit of each other that, notwithstanding any breach of any of agreement hereunder, none of them shall be entitled to enjoin or otherwise restrain the exploitation of the Picture for any reason whatsoever, all of which remedies are hereby irrevocably waived.

15.      **Notices.**   All notices hereunder shall be in writing and addressed to the respective addresses set forth above (unless and until written notice to the contrary is received), and shall be given by personal delivery, certified mail (postage prepaid, return receipt requested), by nationally recognized overnight carrier or confirmed facsimile transmission. The date (i) of personal delivery to an office or facsimile transmission, (ii) one (1) business day after the date of mailing with a nationally recognized overnight carrier mailing, or (iii) three (3) business days after the date of mailing by certified mail, as the case may be, shall be deemed the date of service. Any notices to YPC shall include a courtesy copy to Yarbrough Production Company, LLC, 155 Franklin Road, Suite 255, Brentwood, TN 37027, Attn: Todd McTavish, Esq.

16.      **Merger.**   This Agreement sets forth entire agreement between the parties with respect to the subject matter hereof, superseding all prior or contemporaneous agreements, understandings, or discussions. This Agreement may be amended, and any provision hereof may be waived or otherwise modified, only by a writing signed by each party.

17.      **No Partnership.**   Nothing in this Agreement shall constitute or be deemed to constitute a partnership or joint venture, or create or be deemed to create a relationship of principal and agent between, the Producer on the one hand and Investors on the other hand.

18.      **Arbitration, Governing Law, Venue.**   Any controversy or claim arising out of, or relating to this Agreement, or any alleged breach hereof shall be settled by arbitration before a single arbitrator with active experience in motion picture producing within the five (5) years prior to such arbitration, in accordance with the rules then obtaining of the American Arbitration Association, and judgment upon the award rendered by the arbitrator shall be entered solely in the highest court of the forum, state or Federal, having jurisdiction thereof. Said arbitrator shall be empowered to award reasonable third-party attorney fees, costs and expenses to the prevailing party. The parties hereby irrevocably consent and agree (a) to the exclusive jurisdiction of the state and Federal courts having jurisdiction over Williamson County, Tennessee with respect to any action which either party desires to commence arising out of or in connection with this Agreement and the parties, (b) to any venue in such jurisdiction as proper and

Oct. 06 2009 9:52AM    HP LASERJET FAX                           p.4

convenient, and (c) to resolve any and all such actions in accordance with the laws of the state of Tennessee. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

Sincerely yours,

Set in Space, Inc.

By:

Name: Bret Sewm

Title:

Oct 06 2009 9:52nm    HP LASERJET FAX                                    p.2

AGREED AND ACCEPTED:

IMG Film, Incorporated

By: _____
Name: Bret Saxon
Title: Chairman

Yarbrough Production Company, LLC

By: _____
Name: Jon Yarbrough
Title: Member

## GUARANTY OF
## IMG Film, Incorporated and Bret Saxon

This GUARANTY (the "Guaranty") is made this October 6, 2009, by IMG Film, Incorporated ("IMG") and Bret Saxon (each a "Guarantor" and collectively, the "Guarantors") in favor of Yarbrough Production Company, LLC ("YPC").

WHEREAS, under the above "Fandango" Financing Letter Agreement (the "Agreement"), YPC agreed to invest $1,500,000 (the "Investment") in a motion picture project tentatively called "Fandango" (the "Picture");

WHEREAS, the Guarantors acknowledge that the Guarantors will directly and materially benefit from the Investment;

NOW, THEREFORE, in consideration of the foregoing facts and premises and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties agree as follows:

Guarantors hereby jointly and severally unconditionally and irrevocably guaranty to YPC the payment when due of all amounts payable by Set In Space, Inc. (the "Producer") and the performance of all obligations of Producer under the Agreement.

Guarantors further agree jointly and severally to pay interest on amounts payable by Producer and not paid when due under the Agreement from the date due to the date paid at the rate of 10% per annum, compounded quarterly, and any and all out-of-pocket costs and expenses and reasonable fees and disbursements of counsel incurred by YPC in enforcing its rights under this Guaranty.

If Producer fails to pay when due any amount payable by Producer to YPC under the Agreement, the Guarantors shall, upon demand by YPC and without presentment, protest, notice of protest, notice of non-payment or any other notice whatsoever, pay the amount due to YPC, together with interest as aforesaid, by wire transfer to the account designated by YPC in its demand. If Producer fails to perform any of its other obligations under the Agreement, the Guarantors shall upon demand by YPC and without any other notice, cause Producer to or themselves perform such other obligations. YPC need not prior to enforcing its rights under this Guaranty (i) exhaust any other remedies YPC may have against Producer, (ii) enforce YPC's rights against any collateral held to secure the Guarantors' payment hereunder or (iii) resort to any other means of obtaining payment of the outstanding amount due.

As security for the obligations of the Guarantors hereunder, Bret Saxon hereby pledges to YPC the collateral listed on Schedule A attached hereto (the "Collateral"), authorizes YPC to take such steps as it deems necessary to perfect its interest therein and in the event of any failure by the Guarantors to comply with their obligations hereunder to dispose of the same in accordance with law and apply the proceeds against the Guarantors' obligations hereunder. Bret Saxon represents and warrants that (i) he is the sole member of IMG Film 7, LLC ("IMG Film 7"), a limited liability company formed pursuant to the Delaware Limited Liability Company Act on April 27, 2006, which in turn owns all right and title to the motion picture entitled "The Grand," starring Woody Harrelson, Cheryl Hines and Ray Romano, and all allied, ancillary, subsidiary and derivative rights therein and all proceeds thereof, whether now in existence or hereafter made, acquired or produced, (ii) Bret Saxon, as the sole member of IMG Film 7, will take all action required by YPC to reflect on the books and records of IMG Film 7, IMG Film 7's operating agreement, and any certificate representing his interest therein, the pledge provided for hereby and will execute and deliver any and all such documentation that shall be required by YPC to perfect its interest in the Collateral, (iii) the Collateral and "The Grand" are free of any liens and encumbrances, (iv)

at all times that this Guaranty is in effect IMG Film 7 will continue to operate in the ordinary course, (v) at all times that this Guaranty is in effect IMG Film 7 will not dispose of or otherwise encumber any of its rights to and interest in the "The Grand", and (vi) at all times that this Guaranty is in effect Bret Saxon will not dispose of or otherwise encumber any of his rights to and interest in the Collateral.

The obligations of IMG under this Guaranty are in addition to IMG's obligations under Paragraph 4 of the Agreement.

Each Guarantor absolutely, irrevocably, and unconditionally waives notice of acceptance of this Guaranty and notice of any payment, liability or obligation to which it may apply, and waives presentment, demand of payment, protest, notice of dishonor, nonpayment or non-performance of such liabilities under this Guaranty and any suit or taking other action by YPC against, and any other notice to, any party liable thereon or any property which may be security therefor.

This Guaranty is a direct and primary obligation of each Guarantor. This is a guaranty of payment and performance, and not merely a guaranty of collection.

Each Guarantor hereby agrees that its obligations under this Guaranty shall not be released, impaired or adversely affected by any of the following and waives any rights which Guarantor might otherwise have as a result of or in connection with any of the following:

(i)  Any renewal or modification of all or any part of the Agreement or this Guaranty,

(ii)  Any adjustment, forbearance or compromise granted by YPC to Producer under the Agreement or to Guarantors under this Guaranty, or

(iii)  The taking of any additional collateral or other guaranty, or other assurance of payment, for all or any part of the obligations secured by this Guaranty.

In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any decision thereunder, YPC is required to rescind or restore any payment or any part thereof received by the Guarantors in satisfaction of their obligations hereunder, any prior release or discharge from the terms of this Guaranty given by YPC to the Guarantors shall be without effect, and this Guaranty shall remain in full force and effect.

The Guarantors represent and warrant that they have the power and authority, and the legal right, to make, deliver and perform under this Guaranty and have taken all necessary actions to authorize execution, delivery and performance under this Guaranty. This Guaranty has been duly executed and delivered on behalf of the signing parties. This Guaranty constitutes legal, valid, and binding obligations of the parties, enforceable against them in accordance with its terms.

Waiver of any term or condition of this Guaranty by any party hereto shall only be effective if in writing and shall not be construed as a waiver of any subsequent breach or failure of the same term or condition, or as waiver of any other term or condition of this agreement. No failure on the part of a party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

This Guaranty contains the entire understanding and agreement of the parties and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications

Oct 06 2009 9:52AM    HP LASERJET FAX                                      p.3

of the parties or their representatives, oral or written, with respect to the subject matter set forth in this Guaranty. No amendment, modification, or cancellation of any term or condition of this Guaranty shall be effective unless executed in writing by all parties to this Guaranty.

This Guaranty, including all matters of construction, validity and performance, shall be governed by and construed and enforced in accordance with the laws of the State of Tennessee without regard to conflict-of-law principles.

The parties consent to the exclusive jurisdiction of the Courts of Tennessee located in the County of Williamson, and the U.S. District Court for the Middle District of Tennessee, for the enforcement of this Guaranty and any dispute that may arise hereunder.

Neither this Guaranty nor any rights under this Guaranty, including the right to payment, may be assigned or transferred by the Guarantors.

This Guaranty may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed to be an original of this Guaranty.

IN WITNESS WHEREOF, this Guaranty has been duly executed and delivered by the Guarantors as of the date first above written.


Agreed to and Acknowledged by:

IMG FILM, INCORPORATED


By: _____

Name: Bret Saxon

Title: Chairman


_____

Name: Bret Saxon, individually

**SCHEDULE A**

The Collateral pledged as security for the Guarantors' obligations under this Guaranty shall be Bret Saxon's membership interest in IMG Film 7, LLC, a limited liability company formed pursuant to the Delaware Limited Liability Company Act on April 27, 2006.

**Exhibit A**

Approved Budget Top Sheet (See Attached)

Fandango
8/13/09

PREP: 25 Days
SHOOT: 20 Days
35MM/DI/Film Out
LOCATION: Tennessee
SAG, DGA, IATSE, TEAMSTERS

WRITER: Dennis Sonnenschein, Keith Suggs, Gregory Gieras
DIRECTOR: Jonathan Meyers
PRODUCER: Jeff Bowler, Bret Saxon

| Acct No | Category Description | Page | Total |
|---|---|---|---|
| 1200 | STORY & OTHER RIGHTS | 1 | $54,890 |
| 1300 | PRODUCERS (line/associate/execs) | 1 | $225,000 |
| 1400 | DIRECTOR | 1 | $99,402 |
| 1500 | CAST | 2 | $1,504,617 |
| | **TOTAL ABOVE-THE-LINE** | | **$1,883,909** |
| 2100 | EXTRAS | 4 | $134,484 |
| 2200 | PRODUCTION STAFF | 4 | $246,361 |
| 2300 | ART DEPARTMENT | 6 | $79,586 |
| 2400 | SET CONSTRUCTION | 6 | $81,611 |
| 2500 | SPECIAL EFFECTS | 7 | $53,904 |
| 2600 | SET OPERATIONS | 8 | $100,012 |
| 2700 | ELECTRIC DEPARTMENT | 9 | $116,336 |
| 2800 | CAMERA DEPARTMENT | 10 | $193,987 |
| 2900 | PRODUCTION SOUND | 12 | $57,454 |
| 3000 | SET DRESSING | 12 | $103,993 |
| 3100 | WARDROBE | 15 | $306,520 |
| 3200 | MAKE-UP & HAIR DRESSING | 16 | $72,762 |
| 3300 | PROPERTY | 17 | $155,660 |
| 3400 | TRANSPORTATION | 18 | $216,068 |
| 3500 | LOCATIONS | 20 | $211,678 |
| 3600 | PRODUCTION OFFICE | 22 | $60,500 |
| 3700 | PRODUCTION FILM & LAB | 23 | $162,630 |
| | **TOTAL BELOW-THE-LINE** | | **$2,133,564** |
| 4100 | EDITORIAL | 24 | $167,261 |
| 4200 | POST FILM & LAB | 24 | $96,960 |
| 4300 | POST SOUND | 25 | $46,541 |
| 4400 | MUSIC | 26 | $165,000 |
| 4500 | TITLES & VISUAL FX | 26 | $17,200 |
| | **TOTAL POST PRODUCTION** | | **$492,962** |
| 5100 | GENERAL EXPENSES | 27 | $89,400 |
| 5200 | DELIVERABLES | 27 | $69,820 |
| | **TOTAL OTHER** | | **$159,220** |
| | CONTINGENCY : 10.0% | | $319,166 |
| | **Total Above-The-Line** | | **$1,883,909** |
| | **Total Below-The-Line** | | **$2,785,746** |
| | **Total Above and Below-The-Line** | | **$4,669,655** |
| | **Grand Total** | | **$4,988,821** |

Budget prepared by: A. Palitz

| Acct No | Account Description | Page | Total |
|---|---|---|---|
| 1200 | STORY & OTHER RIGHTS | | |
| 1201 | Screenplay Purchase | 1 | $50,000 |
| 1202 | Script Timing | 1 | $300 |
| 1204 | Registration & Copyrights | 1 | $1,590 |
| 1206 | Production Clearances | 1 | $2,500 |
| 1207 | Script Duplication | 1 | $500 |
| 1299 | Total Fringes | | $0 |
| | Account Total for 1200 | | $54,890 |
| | | | |
| 1300 | PRODUCERS (line/associate/execs) | | |
| 1301 | Executive Producers | 1 | $20,000 |
| 1302 | Producers | 1 | $165,000 |
| 1303 | Line Producers | 1 | $40,000 |
| 1399 | Total Fringes | | $0 |
| | Account Total for 1300 | | $225,000 |
| | | | |
| 1400 | DIRECTOR | | |
| 1401 | Director | 1 | $75,000 |
| 1403 | Storyboard Artist | 1 | $2,000 |
| 1499 | Total Fringes | | $22,402 |
| | Account Total for 1400 | | $99,402 |
| | | | |
| 1500 | CAST | | |
| 1501 | Principal Cast | 2 | $1,150,000 |
| 1502 | Supporting Cast | 2 | $27,130 |
| 1503 | Day Players | 2 | $21,540 |
| 1504 | Stunts | 2 | $56,558 |
| 1505 | ADR/Looping | 3 | $10,000 |
| 1506 | Casting | 3 | $23,600 |
| 1507 | Teacher/Welfare | 3 | $1,400 |
| 1508 | Insurance Exams | 3 | $1,500 |
| 1509 | Cast Expenditures | 3 | $3,500 |
| 1510 | Rehearsals | 3 | $1,000 |
| 1599 | Total Fringes | | $208,389 |
| | Account Total for 1500 | | $1,504,617 |
| | | | |
| | TOTAL ABOVE-THE-LINE | | $1,883,909 |
| 2100 | EXTRAS | | |
| 2101 | Union Extras | 4 | $53,560 |
| 2102 | Non-Union Extras | 4 | $26,780 |
| 2103 | Stand-Ins | 4 | $11,948 |
| 2104 | Bumps/Adjustments | 4 | $1,000 |
| 2105 | Extra's Casting | 4 | $11,536 |
| 2106 | Extra's Wrangler | 4 | $5,000 |

| Acct No | Account Description | Page | Total |
|---|---|---|---|
| 2199 | Total Fringes | | $26,657 |
| | Account Total for 2100 | | $134,481 |
| | | | |
| 2200 | PRODUCTION STAFF | | |
| 2201 | Production Manager | 4 | $33,340 |
| 2202 | 1st Assistant Director | 4 | $25,312 |
| 2203 | 2nd Assistant Director | 4 | $12,744 |
| 2204 | 2nd 2nd Assistant Director | 4 | $12,030 |
| 2205 | Production Coordinator | 5 | $12,070 |
| 2206 | A.P.O.C | 5 | $7,472 |
| 2207 | Production Accountant | 5 | $15,000 |
| 2208 | Asst. Production Accountants | 5 | $11,439 |
| 2209 | Location Manager | 5 | $22,464 |
| 2211 | Script Supervisor | 5 | $8,297 |
| 2212 | Office Production Assistants | 5 | $2,500 |
| 2213 | Set Production Assistants | 5 | $10,250 |
| 2245 | Kit Rentals | 5 | $21,200 |
| 2255 | OT Allowance | 5 | $7,900 |
| 2299 | Total Fringes | | $44,743 |
| | Account Total for 2200 | | $246,361 |
| | | | |
| 2300 | ART DEPARTMENT | | |
| 2301 | Production Designer | 6 | $26,000 |
| 2302 | Art Director | 6 | $17,487 |
| 2303 | Art Department Coordinator | 6 | $7,633 |
| 2304 | Art Department Assistants | 6 | $6,250 |
| 2315 | Materials/Supplies | 6 | $3,000 |
| 2330 | Rentals | 6 | $2,000 |
| 2345 | Kit Rentals | 6 | $4,800 |
| 2350 | L & D | 6 | $900 |
| 2399 | Total Fringes | | $11,916 |
| | Account Total for 2300 | | $79,586 |
| | | | |
| 2400 | SET CONSTRUCTION | | |
| 2401 | Set Construction Coordinator | 7 | $11,000 |
| 2402 | Construction Foreman | 7 | $11,000 |
| 2403 | Construction Labor | 7 | $8,000 |
| 2406 | Trash Removal | 7 | $1,500 |
| 2415 | Purchases | 7 | $15,000 |
| 2430 | Rentals | 7 | $5,000 |
| 2445 | Kit Rentals | 7 | $3,200 |
| 2450 | L & D | 7 | $500 |
| 2499 | Total Fringes | | $6,411 |
| | Account Total for 2400 | | $61,611 |
| | | | |
| 2500 | SPECIAL EFFECTS | | |
| 2501 | SPFX Coordinator | 7 | $12,000 |
| 2502 | SPFX Foreman | 7 | $8,750 |
| 2503 | SPFX Assistants/Labor | 7 | $8,750 |
| 2515 | Materials/Supplies | 8 | $13,500 |

| Acct No | Account Description | Page | Total |
|---|---|---|---|
| 2530 | Rentals | 8 | $2,500 |
| 2545 | Kit Rentals | 8 | $1,600 |
| 2550 | L & D | 8 | $500 |
| 2599 | Total Fringes | | $6,304 |
| | Account Total for 2500 | | $53,904 |
| | | | |
| 2600 | SET OPERATIONS | | |
| 2601 | Key Grip | 8 | $9,455 |
| 2602 | Best Boy Grip | 8 | $7,944 |
| 2603 | Dolly Grip | 8 | $7,464 |
| 2604 | Company Grips | 8 | $21,960 |
| 2605 | Addt. Grip Labor | 9 | $3,462 |
| 2606 | Set Medic | 9 | $7,039 |
| 2615 | Rentals | 9 | $21,550 |
| 2630 | Purchases/Expendables | 9 | $6,000 |
| 2645 | Kit Rentals | 9 | $2,400 |
| 2650 | L & D | 9 | $500 |
| 2599 | Total Fringes | | $12,248 |
| | Account Total for 2600 | | $100,012 |
| | | | |
| 2700 | ELECTRIC DEPARTMENT | | |
| 2701 | Gaffer | 9 | $8,899 |
| 2702 | Best Boy Electrician | 9 | $7,643 |
| 2703 | Light Technicians | 9 | $21,565 |
| 2704 | Condor/Grny Techs | 10 | $6,924 |
| 2705 | Addt. Electric Labor | 10 | $3,462 |
| 2715 | Purchases/Expendables | 10 | $8,000 |
| 2730 | Rentals | 10 | $47,400 |
| 2745 | Kit Rental | 10 | $1,600 |
| 2750 | L & D | 10 | $500 |
| 2799 | Total Fringes | | $10,363 |
| | Account Total for 2700 | | $116,356 |
| | | | |
| 2800 | CAMERA DEPARTMENT | | |
| 2801 | Director of Photography | 10 | $28,000 |
| 2802 | Camera Operator | 11 | $19,659 |
| 2803 | 1st Assistant Camera | 11 | $18,728 |
| 2804 | 2nd Assistant Camera | 11 | $43,073 |
| 2805 | Loader | 11 | $6,566 |
| 2807 | Steadicam Operator | 11 | $11,234 |
| 2808 | Stills Photographer | 11 | $4,814 |
| 2815 | Purchases/Expendables | 11 | $2,000 |
| 2830 | Rentals | 11 | $66,008 |
| 2845 | Kit Rentals | 11 | $1,600 |
| 2850 | L & D | 12 | $500 |
| 2899 | Total Fringes | | $21,813 |
| | Account Total for 2800 | | $193,987 |
| | | | |
| 2900 | PRODUCTION SOUND | | |
| 2901 | Sound Mixer | 12 | $13,258 |

| Acct No | Account Description | Page | Total |
|---|---|---|---|
| 2902 | Boom Operator | 12 | $8,456 |
| 2903 | Video/Audio Playback | 12 | $7,787 |
| 2904 | Cable Man/Recorder | 12 | $8,098 |
| 2910 | Sound Equipment | 12 | |
| 2915 | Purchases/Expendables | 12 | $7,000 |
| 2920 | Rentals | 12 | $1,080 |
| 2950 | L & D | 12 | $3,240 |
| 2999 | | | $500 |
| | Total Fringes | | $8,035 |
| | Account Total for 2900 | | $57,454 |
| | | | |
| 3000 | SET DRESSING | | |
| 3001 | Set Decorator | 13 | $18,925 |
| 3002 | Leadman | 13 | $12,444 |
| 3003 | On Set Dresser | 13 | $8,280 |
| 3005 | Swing Gang | 13 | $19,261 |
| 3015 | Set Purchases | 13 | $19,500 |
| 3030 | Set Rentals | 14 | $10,500 |
| 3045 | Kit Rentals | 14 | $1,200 |
| 3050 | L & D | 15 | $50 |
| 3099 | Total Fringes | | $13,833 |
| | Account Total for 3000 | | $103,993 |
| | | | |
| 3100 | WARDROBE | | |
| 3101 | Costume Designer | 15 | $13,750 |
| 3102 | Key Costumer | 15 | $28,255 |
| 3103 | Costumers | 15 | $13,446 |
| 3104 | Additional Labor | 15 | $5,042 |
| 3115 | Purchases | 15 | $10,000 |
| 3116 | Background Wardrobe | 15 | $8,000 |
| 3130 | Rentals | 16 | $10,000 |
| 3131 | Alterations | 16 | $5,000 |
| 3132 | Cleaning | 16 | $1,000 |
| 3145 | Kit Rentals | 16 | $1,600 |
| 3150 | L & D | 16 | $500 |
| 3199 | Total Fringes | | $12,927 |
| | Account Total for 3100 | | $106,520 |
| | | | |
| 3200 | MAKE-UP & HAIR DRESSING | | |
| 3201 | Key Make-up Artist | 16 | $8,984 |
| 3202 | Make-Up Artists | 16 | $15,221 |
| 3203 | Additional Make-up | 16 | $3,805 |
| 3204 | Key Hairstylists | 16 | $8,121 |
| 3211 | Hairstylists | 16 | $13,849 |
| 3212 | Additional Hairstylists | 16 | $3,462 |
| 3215 | Makeup Supplies | 17 | $3,000 |
| 3220 | Hairdressing Supplies | 17 | $2,000 |
| 3245 | Kit Rentals | 17 | $2,400 |
| 3250 | L & D | 17 | $500 |
| 3299 | Total Fringes | | $11,420 |
| | Account Total for 3200 | | $72,762 |

| Acct No | Account Description | Page | Total |
|---|---|---|---|
| **3300** | **PROPERTY** | | |
| 3301 | Property Master | 17 | $19,467 |
| 3302 | Asst. Property Master | 17 | $17,192 |
| 3303 | Addt. Prop Labor | 17 | $5,158 |
| 3304 | Weapons Handler | 17 | $5,840 |
| 3308 | Picture Vehicles | 17 | $35,030 |
| 3309 | Animals | 18 | $46,479 |
| 3315 | Prop Purchases | 18 | $5,000 |
| 3330 | Prop Rentals | 18 | $5,000 |
| 3345 | Kit Rentals | 18 | $1,200 |
| 3350 | L & D | 18 | $500 |
| 3399 | Total Fringes | | $14,774 |
| | Account Total for 3300 | | $155,660 |
| | | | |
| **3400** | **TRANSPORTATION** | | |
| 3401 | Transportation Coordinator | 18 | $17,055 |
| 3402 | Transportation Captain | 18 | $14,512 |
| 3403 | Drivers | 18 | $91,122 |
| 3415 | Vehicle Rentals | 19 | $39,340 |
| 3430 | Truck Outfitting/Purchases | 19 | $1,500 |
| 3435 | Gas & Oil | 19 | $20,000 |
| 3436 | Mileage/Car Allowances | 19 | $5,000 |
| 3445 | Kit Rentals | 19 | $800 |
| 3450 | L & D | 19 | $500 |
| 3499 | Total Fringes | | $26,219 |
| | Account Total for 3400 | | $216,068 |
| | | | |
| **3500** | **LOCATIONS** | | |
| 3501 | Site Fees | 20 | $66,500 |
| 3502 | Parking | 20 | $6,000 |
| 3503 | Holding/Catering Areas | 21 | $6,000 |
| 3504 | Police & Fire | 21 | $12,000 |
| 3505 | Security | 21 | $12,000 |
| 3515 | Location Rentals | 21 | $4,000 |
| 3516 | Portable Restrooms | 21 | $5,000 |
| 3517 | Trash Removal | 21 | $2,000 |
| 3520 | Crafty | 21 | $27,253 |
| 3525 | Catering | 21 | $59,600 |
| 3550 | L & D | 22 | $500 |
| 3599 | Total Fringes | | $10,825 |
| | Account Total for 3500 | | $211,678 |
| | | | |
| **3600** | **PRODUCTION OFFICE** | | |
| 3601 | Office Space Rental | 22 | $14,000 |
| 3602 | Photocopies | 22 | $2,000 |
| 3603 | Telephone & Internet | 22 | $12,400 |
| 3604 | Postage & Shipping | 22 | $11,500 |
| 3605 | Courier | 22 | $1,500 |
| 3607 | Cell Phone Allowance | 22 | $2,000 |

Aug 17, 2009 10:49:45 PM

| Acct No | Account Description | Page | Total |
|---|---|---|---|
| 3615 | Equipment Rentals | 22 | $7,100 |
| 3630 | Office Supplies/Purchases | 22 | $10,000 |
| 3699 | Total Fringes | | $0 |
| | Account Total for 3600 | | $60,800 |
| | | | |
| 3700 | PRODUCTION FILM & LAB | | |
| 3701 | Raw Stock Purchase | 23 | $112,850 |
| 3702 | Developing/Processing | 23 | $22,500 |
| 3703 | Video/Audio Transfer | 23 | $24,000 |
| 3704 | Projected Dailies | 23 | $1,500 |
| 3705 | Dubs | 23 | $900 |
| 3715 | Tape Stock Purchases | 23 | $880 |
| 3799 | Total Fringes | | $0 |
| | Account Total for 3700 | | $162,630 |
| | | | |
| | TOTAL BELOW-THE-LINE | | $2,133,564 |
| 4100 | EDITORIAL | | |
| 4101 | Production Supervisor | 24 | $20,000 |
| 4102 | Editor | 24 | $45,043 |
| 4102 | Assistant Editors | 24 | $27,707 |
| 4104 | System Rental | 24 | $26,400 |
| 4105 | Projection | 24 | $2,000 |
| 4115 | Purchases | 24 | $7,500 |
| 4116 | Post Accountant | 24 | $12,000 |
| 4117 | Post Courier | 24 | $5,000 |
| 4120 | Meal Allowances | 24 | $3,500 |
| 4199 | Total Fringes | | $18,111 |
| | Account Total for 4100 | | $167,261 |
| | | | |
| 4200 | POST FILM & LAB | | |
| 4201 | Negative Cutting | 24 | $10,650 |
| 4202 | Film/Video Transfers | 24 | $15,000 |
| 4203 | Optical Sound Track | 25 | $5,370 |
| 4204 | Answer Prints | 25 | $11,050 |
| 4205 | Release Print | 25 | $2,520 |
| 4206 | Interpositive | 25 | $10,560 |
| 4207 | Internegative | 25 | $10,560 |
| 4208 | Stock Footage | 25 | $5,000 |
| 4209 | HD DI | 25 | $26,250 |
| 4299 | Total Fringes | | $0 |
| | Account Total for 4200 | | $96,960 |
| | | | |
| 4300 | POST SOUND | | |
| 4301 | Sound Supervisor/Editor | 25 | $3,000 |
| 4302 | Assistant Sound Editor | 25 | $2,000 |
| 4303 | Foley Artist | 25 | $3,400 |
| 4304 | FX Editor | 25 | $3,000 |
| 4305 | Sound House/Recording Studio | 25 | $6,500 |
| 4306 | Sound Mix | 25 | $22,600 |
| 4307 | Stereo License | 25 | $2,500 |

| Acct No | Account Description | Page | Total |
|---------|---------------------|------|-------|
| 4315 | Purchases | 26 | $500 |
| 4599 | Total Fringes | | $3,041 |
| | Account Total for 4300 | | $46,541 |
| | | | |
| 4400 | **MUSIC** | | |
| 4401 | Music Supervisor | 26 | $10,000 |
| 4402 | Composer | 26 | $40,000 |
| 4403 | Music Clearances | 26 | $100,000 |
| 4404 | Rights & Licensing Costs | 26 | $10,000 |
| 4405 | Scoring | 26 | $5,000 |
| 4499 | Total Fringes | | $0 |
| | Account Total for 4400 | | $165,000 |
| | | | |
| 4500 | **TITLES & VISUAL FX** | | |
| 4501 | Main & End Titles | | |
| 4502 | Title Designer | 26 | $12,000 |
| 4506 | Lab Processing/Developing | 26 | $4,000 |
| 4508 | Textless Titles | 26 | $200 |
| 4599 | Total Fringes | 26 | $1,000 |
| | | | $0 |
| | Account Total for 4500 | | $17,200 |
| | | | |
| | **TOTAL POST PRODUCTION** | | $492,962 |
| 5100 | **GENERAL EXPENSES** | | |
| 5101 | Insurance | 27 | $48,500 |
| 5102 | Legal Fees | 27 | $25,000 |
| 5103 | Bank Fees | 27 | $1,000 |
| 5104 | Corporate Accounting | 27 | $2,000 |
| 5106 | Corporate Overhead | 27 | $8,400 |
| 5108 | Preview Expense | 27 | $2,000 |
| 5110 | Wrap Party | 27 | $2,500 |
| 5199 | Total Fringes | | $0 |
| | Account Total for 5100 | | $89,400 |
| | | | |
| 5200 | **DELIVERABLES** | | |
| 5201 | Film to Tape Transfers | 27 | $33,100 |
| 5202 | Film Out | 27 | $25,000 |
| 5203 | MPAA Rating | 27 | $4,000 |
| 5204 | Closed Captioning | 27 | $1,200 |
| 5205 | Continuity/Spotting Script CCSL | 28 | $1,520 |
| 5206 | Quality Control Reports | 28 | $1,500 |
| 5208 | Subtitling/Dubbing | 28 | $1,500 |
| 5209 | Tape Stock | 28 | $2,000 |
| 5299 | Total Fringes | | $0 |
| | Account Total for 5200 | | $69,820 |
| | | | |
| | **TOTAL OTHER** | | $159,220 |
| | CONTINGENCY : 10.0% | | $319,166 |
| | **Total Above-The-Line** | | $1,883,909 |

Aug 17, 2009 10:49:45 PM

| Acct No | Account Description | Page | Total |
|---|---|---|---|
| | Total Below-The-Line | | $2,785,746 |
| | Total Above and Below-The-Line | | $4,669,695 |
| | Grand Total | | $4,988,821 |

**Exhibit B**

Delivery Requirements

These Delivery Requirements shall be deemed incorporated into that Agreement dated as of October 6, 2009 among Set in Space, Inc. ("Producer"), IMG Film, Incorporated and Yarbrough Production Company, LLC. Producer's obligations in connection with the Picture shall not be complete until Producer has physically delivered to a domestic distributor (or is capable of delivery of the same to a domestic distributor), except as otherwise noted therein, each and every item and element listed below. All Film and Video Material shall be of commercially acceptable quality.

**A.  FILM MATERIALS AND VIDEO MATERIALS:**

1.      Digital Video Masters – NTSC/PAL:  One (1) Digital Beta closed captioned drop frame video masters individually manufactured (conversions not acceptable) in each of the NTSC and PAL formats as follows:  (a) Full frame pan and scan (if required by a distributor); and (b) 16x9 anamorphic widescreen. Transfer master required with stereo audio if stereo elements exist (if not, then mono elements). Channels 3 & 4 shall contain stereo M&E. Textless background shall be attached to the tail of the video masters.

2.      D,M,E Track:  On NTSC and PAL DA-88 cassettes, on no more than two (2) cassettes each format, discrete production sound/dialogue, discrete stereo music and discrete stereo effects, conformed in all respects to the Video Masters (i.e. continuous, drop frame, with no reel breaks).

**B.  DOCUMENTATION:**

1.      Personnel Agreements:  Copies of fully-executed agreements or deal memos for the director, producer, composer and personnel who are afforded credit on-screen in the main or the billing block, along with a key crew contact list.

2.      Releases:  Signed releases from all persons identified by name or likeness in the Picture who do not have signed contracts.

3.      Third Party Content Releases:  Signed releases for all stock footage, images, product placements, film clips, or other third party materials used in the Picture, along with a summary sheet stating, for each element of third party content, the copyright owner, usage, as well as the film footage and running time, if applicable.

4.      Music Cue Sheet:  A Music Cue Sheet stating for each composition in the Picture the title, the composers, publishers, copyright owners, usage, performing rights society, as well as the film footage and running time.

5.      Music Licenses:  Fully-executed synchronization and master use licenses, in perpetuity, for each item of licensed music used in the Picture, provided there shall be no use of third-party music in advertising and no "out of context" use; fully-executed agreements for each composer of underscoring on an all media buy-out basis (e.g. no future payment obligations); and evidence of payment under each synchronization and master use license and composer agreement.

6.      Screen Credits/Paid Ad Statement.  A complete typewritten copy of the final credits to be accorded on screen in the main and end titles and a statement of paid ad credit requirements to be used in connection with the Picture.

7.    Continuity List.    One detailed combined dialogue and action continuity list.

8.    Producer's Errors and Omissions Insurance:  One (1) copy of the policy, and one (1) Certificate of standard producer's Errors & Omissions Liability Insurance under a stand alone policy which provides that such insurance: (i) has a coverage limit of no less than $2,000,000 USD per claim and $10,000,000 USD in the aggregate, with a deductible of no greater than $10,000 USD; (ii) cannot be cancelled or modified without first providing Investors (and relevant distributor) with thirty (30) days prior written notice via registered mail; (iii) is not subject to any non-standard endorsements or exclusions from, restrictions of or limitations in coverage, or any material difference in deductibles as the standard in the industry; and (iv) provides coverage for all music, film clips (if any) used in the Picture as well as the title of the Picture, without restriction. Such policy shall name each Investor (and relevant distributor) as additional insureds, its parent, subsidiary and affiliated companies, successors, sub-distributors, licensees, sub-licensees, advertisers and assigns and the respective officers, directors, shareholders, attorneys, employees, agents and any other representatives of any and all of the foregoing and shall contain an endorsement that negates the "other insurance" clause in the policy and a statement that the insurance being provided is primary and not contributing to or in excess of any errors and omissions insurance carried by any Investor (or relevant distributor) or any other person or entity (other than Producer), with evidence showing that the premium for such policy has been paid in full for 3 years from the date of delivery.  Each Investor (and relevant distributor), at its request, shall be provided certificates and endorsements naming its licensees/designees as additional insureds when necessary at no charge to such Investor (and relevant distributor).

9.    Chain of Title:  Complete chain of title materials, which shall include:

a.    Underlying Rights Documents:  Complete chain of title materials, reasonably suitable to the Investors (or relevant distributor, as applicable) evidencing Producer's ownership of the Picture and all underlying property and Producer's right, title and authority to grant distribution rights in the Picture.

b.    Copyright Registration Certificate:  One (1) filed U.S. Copyright Registration Certificate/Form PA (applied for and stamped by the Library of Congress) for the Picture.

c.    Certificate of Origin: Ten (10) original notarized Certificates of Origin of the Picture in the form required by Investors (or relevant distributor, as applicable).

d.    Short Form Assignment/Instrument of Transfer (notarized):  If required by distributor, three (3) original notarized assignments of the rights granted to the relevant distributor in and to the Picture under the Agreement.

e.    Title Report:  One (1) current (no more than 60 days old) title report showing that the title of the Picture is available for use without infringing on any other person or entity's rights.

f.    Copyright Report:  One (1) current (no more than 60 days old) copyright report showing that Producer and Investors have good clear title to the picture and all underlying rights.

FILED
WILLIAMSON COUNTY

**IN THE CHANCERY COURT OF TENNESSEE**
**TWENTY-FIRST JUDICIAL DISTRICT**
**WILLIAMSON COUNTY**

2010 OCT 22  PM 3: 53

ENTERED 10-27-10

YARBROUGH PRODUCTION
COMPANY, LLC,

     Plaintiff,

v.

BRET SAXON; SET IN SPACE, INC.; and
IMG FILM, INC.,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 37602
Chancellor Robbie T. Beal
Jay S. Bowen, Arbitrator

## FINAL ORDER

Plaintiff Yarbrough Production Company, LLC, ("Yarbrough") and Defendants Bret
Saxon, Set In Space, Inc., and IMG Film, Inc., (collectively, the "Defendants") enter this
Final Order.

On February 9, 2010, Plaintiff filed the above-captioned action against Defendants,
alleging Breach of Contract against all Defendants, Fraud against all Defendants,
Enforcement of Guarantee Agreement against IMG and Bret Saxon, and Breach of Trust
against Set In Space and IMG.

Plaintiff and Defendant agree, and this Court finds, that Defendants are liable for
each of the causes of action listed above, and that the amount of damages owed to
Plaintiff is $2,250,000 total.  Plaintiff and Defendants further agree, and this Court finds,
that each cause of action listed above independently incurred damages of $2,250,000 to
Plaintiff, but that the damages stem from the same actions, and require a total damage
finding of $2,250,000.

Plaintiff and Defendant further agree, and this Court further finds, that the liability and damages herein found are not dischargeable pursuant to 11 U.S.C. § 523(a)(2).

IT IS SO ORDERED.

10-27-10.

CHANCELLOR ROBBIE BEAL

APPROVED FOR ENTRY:

William N. Helou, #22839 (wnh@mglaw.net)
Joseph Allen Kelly, #14921 (jak@mglaw.net)
MGLAW, PLLC
2525 West End Avenue, Suite 1475
Nashville, Tennessee 37203
615.846.8000 (phone)
615.845.9000 (fax)
*Counsel for Plaintiff Yarbrough*
*Production Company, LLC*

- and -

Samuel F. Miller, #22936
William A. Lewis, #27377
Baker, Donelson, Bearman,
Caldwell & Berkowitz, PC
Baker Donelson Center
211 Commerce Street, Suite 800
Nashville, Tennessee 37201
smiller@bakerdonelson.com
dlewis@bakerdonelson.com
*Counsel for Defendants Bret Saxon;*
*Set In Space, Inc.; and IMG Film, Inc.*

2

## CERTIFICATE OF SERVICE

I hereby certify that on this the 22ᵈ day of October, 2010, a true and correct copy of the foregoing was served via first-class U.S. mail, postage-prepaid, and electronic mail to each of the following:

Samuel F. Miller, Esq.
William A. Lewis, Esq.
Baker, Donelson, Bearman,
Caldwell & Berkowitz, PC
Baker Donelson Center
211 Commerce Street, Suite 800
Nashville, Tennessee 37201
smiller@bakerdonelson.com
dlewis@bakerdonelson.com
*Counsel for Defendants Bret Saxon;*
*Set In Space, Inc.; and IMG Film, Inc.*

Jay S. Bowen, Esq.
Bowen & Unger, PLC
47 Music Square East
Nashville, Tennessee 37203
jbowen@bowenungerlaw.com
*Arbitrator*

Todd McTavish, Esq.
Amanda S. Thompson, Esq.
Video Gaming Technologies, Inc.
155 Franklin Road, Suite 255
Brentwood, Tennessee 37027
Todd.Mctavish@vgt.net
Amanda.Thompson@vgt.net
*Co-Counsel for Plaintiff Yarbrough*
*Production Company, LLC*

William N. Helou

CLERK'S CERTIFICATE
I hereby certify that a true and exact copy of foregoing has been mailed or delivered to all parties or counsel of record.

11 3 10
Date

Clerk & Master

3

357 092

EXHIBIT D

Bank of America | Online Banking | Transaction Image Print                    Page 1 of 1

**Checking - 4682 : Transaction Details**

   **Transaction Details:**

   **Description:** CA TLR transfer to CHK 2574 Banking Ctr SANTA MONICA BUS PARK #0002345 CA
       Confirmation# 4086435889

   **Posting date:** 08/03/2010

     **Amount:** $250,000.00

       **Type:** Online Transaction

   **Account** Checking-4682
   **number:**

   **Additional Details:**

      **My Description:**

Reuters.com

» Print

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the reprints tool at the top of any article or visit www.reuterreprints.com.

# Insomnia Media gets $550 mln from Egyptian company

Tue, Nov 27 2007

By

LOS ANGELES, Nov 27 (Reuters) - Entertainment company Insomnia Media Group said on Tuesday it is receiving a $550 million cash infusion from Egypt-based Borak Holding, the latest in a growing list of Hollywood companies to obtain Middle East funding.

Under terms of the deal, Insomnia, an independent television and film and talent services company founded in 1994 by Bret Saxon and Jeff Bowler, will retain majority ownership and use the money for acquisitions and additional film projects.

Asset management firm Borak joins an expanding group of companies from the region who are financing Hollywood as U.S. private equity investors, who have pumped an estimated $10 billion into the industry in the last three years, have grown more skittish.

"With oil now at about $98 a barrel, the money from that region is creating enterprise for everything from real estate to entertainment," said Insomnia's Saxon, who also serves as chairman of Transactional Marketing Partners, a marketing consultancy, in an interview.

Insomnia and Borak are currently collaborating on an untitled $70 million war epic being shot in Egypt, Morocco and Los Angeles.

Saxon has worked with Borak for 12 years outside the entertainment sector on real estate and energy deals. "Now, they're looking for more interesting places to put their money," he said, adding foreign investors were more attractive in some ways than U.S. investors in Hollywood.

"These investors are more aggressive and easier to deal with," he said, noting U.S. bankers typically require specific kinds of distribution deals and stars attached up front before committing to film and TV projects.

In September, Warner Bros (TWX.N: Quote, Profile, Research, Stock Buzz) set up a film and video game firm with United Arab Emirates' Aldar Properties ALDR.AD and a UAE media company, with the parties investing $500 million to develop films, and another $500 million on video games. They will also develop a theme park, hotel and cinemas in the Gulf Arab emirate.

In October, Abu Dhabi, capital of the UAE, hosted its first-ever Middle East International Film Festival, bringing together movie moguls like producer Harvey Weinstein and other studio executives with Arab investors.

POLITICS A HURDLE

Veteran media analyst Hal Vogel, chief executive of Vogel Capital Management, agrees that more money is flowing into Hollywood from the Middle East, but said politics could be a hurdle.

"These investors are more serious with oil prices being so high, but it's generally difficult to reconcile the political and cultural base of the region with Hollywood. So I don't know how sticky this money is," he said, citing a recent controversy involving the Israeli film, "The Band's Visit."

The film, about an Egyptian band that gets lost in Israel, triumphed at film festivals around the world, but was banned in Egypt after the Egyptian Actors' Union protested attempts to show it as violation of a cultural boycott they support against Israel.

The union also pressured the Abu Dhabi festival to disqualify its entry, according to the New York Times.

Egypt, once viewed as the Hollywood of the Arab world, produced about 80 films a year at its peak in the 1950s, but cutbacks in government subsidies brought on an industrywide slump that is now attempting to reverse itself. (Reporting by Sue Zeidler; Editing by Jeffrey Benkoe)

© Thomson Reuters 2010. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

EXHIBIT E

Bank of America | Online Banking | Transaction Image Print

Page 1 of 1

**Checking - 4682 : Check Image**

Check Image:



ZB FAMILY TRUST
SCOTT BARBOUR TRUSTEE
21571 MULHOLLAND DR
SUITE 287
WOODLAND HILLS, CA 91364

2028

DATE 8-24-10

PAY TO THE ORDER OF   BRET SAKOW                    |$ 150,000—

One Hundred Fifty Thousand dollars                    DOLLARS

Bank of America
Marina Del Rey
4766 Admiralty Way
Marina Del Rey CA
310 301 2000

FOR _____

⑈0020 28⑈ ⑆122000661⑆ 09147⑈4682⑈        ⑈0015000000⑈

BANK OF AMERICA LLC
6260045307

0000
11377

EXHIBIT C

Page 1 of 1

Subj:     **Fwd: confirmation of transaction(s)**
Date:     8/6/2010 8:22:01 A.M. Pacific Daylight Time
From:     scott@transactionalmarketing.com
To:       tvcops@aol.com

—— Forwarded message from ——
    Date: Tue, 3 Aug 2010 15:32:31 -0700
    From: Rob Stein
    Reply-To: Rob@transactionalmarketing.com
    Subject: confirmation of transaction(s)
    To: 'Scott Barbour'

Scott,

Please utilize this email as confirmation of the following transactions:

ZB Family Trust loaned $150,000 to Conduit Media, Inc. on June 1st, 2010.

ZB Family Trust loaned $250,000 to Bret Saxon, an individual, on August 2rd, 2010.

Both of these loans are due in full on September 1st, 2010.

Thank you for your assistance with this and please let me know if you have any questions.

Thanks,

Rob Stein

Director of Finance

TMP

3340 Ocean Park Blvd.

Suite 1070

Santa Monica, CA 90405

310-392-4042 x-108 (Office

310-392-4052 (Fax)

310-415-9913 (Mobile)

*[handwritten]* IN ADDITION ON 8-24-10, AN ADDITIONAL $150,000 WAS LOANED TO BRET SAXON.

ALL DUE + PAYABLE ON DEMAND.

$150,000   6/1/10
 250,000   8/2/10
 150,000   8/24/10

—— End forwarded message ——

$550,000

BANK OF AMERICA, N.A.
WEST RETURN ITEMS

Page 001 of 002
Bank   : 00319
Center :
Divider: 2,443
Code   : 1

H

Deposit Account:   91-474-4682
Charge Account :   91-474-4682
Store/Reference:A0000000000000

Desk #08

ZB FAMILY TRUST
SCOTT BARBOUR TRUSTEE
23371 MULHOLLAND DR STE 227
WOODLAND HLS  CA     91364
US

Date of Notice: 01-19-2011

Dear Valued Customer:

The item(s) below, which were deposited to your account, have been returned unpaid.
Therefore, we have charged them to your account.  Please adjust your records by
subtracting the total shown below.

If you have any questions or need additional information, please contact one of our
Customer Service Representatives at 1-800-622-8731.  Thank you for choosing Bank of
America.

Number of Returned Items:          1
Amount of Returned Item(s):   550,000.00
Return Items Fee:                 12.00
Total:                       550,012.00

| SEQUENCE/<br>DEP DATE | ABA NUMBER/<br>DEP AMOUNT | MAKER NAME/<br>CHECK DATE | RETURN REASON/<br>Additional Data | AMOUNT |
|---|---|---|---|---|
| 2232092433 | 1220-0049 | | Insufficient Funds | |
| 1/14/2011 | 550,000.00 | | | 550,000.00 |

*111012822*
01/19/2011
5760240672

This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check

RETURN REASON-A
NOT SUFFICIENT
FUNDS

*14460001*
*2443*
*1*
*00001-00133*

**NSF**

BRET SAXON                                          18-49  7041       525
3435 OCEAN PARK BLVD., #107                         1220
SANTA MONICA, CA  90405

                                                    DATE 10/8/10

PAY TO
THE ORDER OF  2B Family Trust                       $ 550,000 —
Five hundred fifty thousand dollars and %           DOLLARS

⊔ UnionBank
The Private Bank

MEMO loan repayment

⑆122000496⑆ 47110147488⑈ 0525 ⑈0055000000⑈

⑆:122000496⑆: 47110147488⑈0525 ⑈0055000000⑈

**EXHIBIT  I**

## Property Profile

### Property Data:

| | |
|---|---|
| Site Address: | Primary Owner: MILLER,MICHAEL L REVOC TRUST |
| 5110 Reynolds Rd | Secondary Owner: |
| Collierville, TN  38017 | Telephone Number: |
| Mail Address: | APN: D0257 00087C |
| | Census Tract: 0215.20 |
| 5110 Reynolds Rd | Housing Tract Number: |
| Collierville, TN  38017 | Legal Description: ES REYNOLDS RD SEE MAP GRID 232 |
| | Subdivision: |
| | Property County: Shelby County |

### Property Characteristics:

Bedrooms: 8              Year Built: 2005          Square Feet: 14453
Bathrooms: 9.00          Use Code: RSFR            Lot Size: 2090880 sq ft (48.00 acres)
Total Rooms: 13          Number of Units: 1        Features: View
Zoning: FW               Amenities: Fireplace

### Sale & Loan Information:

Transfer Date: 5/16/2003           Seller:                  Document:
Transfer Value: $1,200,000.00      Cost/Sq Feet: $83.03     Title Company:
First Loan Amt: $62,000.00         Lender:                  Last Trans: 5/19/2009
Loan Type: Unknown                                          Last Trans Doc: 0000058555

### Assessed & Tax Information:

Assessed Value: $697,325.00        Percent Improvement: 81.89    Homeowner Exemption: N
Land Value: $126,275.00            Tax Amount: $24,106.46        Tax Rate Area: 0
Improvement Value: $571,050.00     Tax Status: Current

This information is compiled from public documents and is not guaranteed.

EXHIBIT "B"

1 │ DANA M. COLE (SBN 89105)
  │ E-Mail: coledana@pacbell.net
2 │ COLE & LOETERMAN
  │ 1925 Century Park East, Suite 2000
3 │ Los Angeles, California 90067
  │ Telephone: 310-556-8300
4 │ Facsimile: 310-772-0807

5 │ Attorneys for Defendant Bret Saxon

6

7 │               UNITED STATES DISTRICT COURT

8 │     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

9

10 │ SCOTT BARBOUR, individually, and       Case No.
   │ ZB FAMILY TRUST, SCOTT
11 │ BARBOUR, Trustee,                      **JOINDER IN NOTICE OF**
   │                                        **REMOVAL OF ACTION**
12 │             Plaintiffs,
   │                                        Trial Date:    None Set
13 │     vs.

14 │ BRET SAXON, an individual;
   │ CONDUIT MEDIA, INC., a California
15 │ corporation; TMP, INC., aka
   │ TRANSACTIONAL MARKETING
16 │ PARTNERS, INC., a California
   │ corporation; ROB STEIN, an
17 │ individual; and DOES 1 through 50,
   │ Inclusive,
18 │
   │             Defendants.
19 │

20 │ TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

21 │         Defendants Conduit Media, Inc. and TMP, Inc. hereby join in the Notice of

22 │ Removal to this Court, filed by Defendant Robert Stein (erroneously sued as Rob

23 │ Stein) of the state court action described in the said Notice of Removal.

24 │ Dated: March 17, 2011                   COLE & LOETERMAN

25 │

26 │                                         By:
27 │                                               Dana M. Cole
   │                                         Attorneys for Defendants Conduit Media,
28 │                                              Inc. and TMP, Inc.

resch polster & berger llp

414902 1

1   RONALD RICHARDS (SBN 199083)
    E-Mail: ron@ronaldrichards.com
2   LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, A.P.C.
    P.O. Box 11480
3   Beverly Hills, CA 90213
    Telephone: 310-556-1001
4   Facsimile: 310-277-3325

5   Attorneys for Defendant Bret Saxon

6

7                    UNITED STATES DISTRICT COURT

8          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

9

10  SCOTT BARBOUR, individually, and          Case No.
    ZB FAMILY TRUST, SCOTT
11  BARBOUR, Trustee,                          **JOINDER IN NOTICE OF**
                                               **REMOVAL OF ACTION**
12             Plaintiffs,
                                               Trial Date:    None Set
13        vs.

14  BRET SAXON, an individual;
    CONDUIT MEDIA, INC., a California
15  corporation; TMP, INC., aka
    TRANSACTIONAL MARKETING
16  PARTNERS, INC., a California
    corporation; ROB STEIN, an
17  individual; and DOES 1 through 50,
    Inclusive,
18
               Defendants.
19

20  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

21        Defendant Bret Saxon hereby joins in the Notice of Removal to this Court,

22  filed by Defendant Robert Stein (erroneously sued as Rob Stein) of the state court

23  action described in the said Notice of Removal.

24  Dated: March 17, 2011              LAW OFFICES OF RONALD
25                                     RICHARDS & ASSOCIATES, A.P.C.

26                                     Ronald Richards,   Digitally signed by Ronald Richards, Esq.
                                                          DN: cn=Ronald Richards, Esq., o=Law Offices
                                                          of Ronald Richards & Associates, A.P.C., ou,
27                                     By: Esq.           email=ron@ronaldrichards.com, c=US
                                                          Date: 2011.03.17 16:02:51 -07'00'
                                          _____
28                                              Ronald Richards
                                          Attorneys for Defendant Bret Saxon

resch polster & berger llp

414902.1                              4

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 9200 Sunset Boulevard, Ninth Floor, Los Angeles, California 90069-3604.

On March/8, 2011, I served true copies of the following document(s) described as **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §1441(B) (FEDERAL QUESTION)** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Resch Polster & Berger LLP's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March/8, 2011, at Los Angeles, California.

Janaki Neptune

resch polster & berger llp

414902.1

1

## SERVICE LIST

2

3   David M. Marcus                          Attorneys for Plaintiffs
    Marcus Watanabe & Dave LLP
4   1901 Avenue of the Stars, Suite 300
    Los Angeles. California 90067-6005
5
    Michael Kerry Burke                      Attorneys for Plaintiff
6   Burke & Associates
    1901 Avenue of the Stars, Suite 300
7   Los Angeles, California 90067-6005

8

9   Ronald Richards, Esq.                    Attorneys   for   Defendant   Bret
    Law Offices of Ronald Richards & Associates,   Saxon
    A.P.C.
10  P.O. Box 11480
    Beverly Hills. CA  90213
11
    DANA M. COLE (SBN 89105)                 Attorneys for Defendants Conduit
12  Cole & Loeterman                         Media, Inc. and TMP, Inc.
    1925 Century Park East, Suite 2000
13  Los Angeles, California 90067

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

resch polster & berger ℓℓp

414902.1

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dolly Gee and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV11- 2335 DMG  (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br>Scott Barbour, individually, and ZB Family Trust, Scott Barbour, Trustee | **DEFENDANTS**<br>Bret Saxon, an individual; Conduit Media, Inc., a California corporation; TMP, Inc., aka Transactional Marketing Partners, Inc., a California corporation; Rob Stein, an individual & Does 1-50, inclusive |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>David M. Marcus<br>Marcus Watanabe & Dave, LLP<br>1901 Avenue of the Stars, Suite 300<br>Los Angeles, CA 90067-6005<br>(310) 284-2020; (310) 284-2025 | Attorneys (If Known)<br>Andrew V. Jablon<br>Resch Polster & Berger LLP<br>9200 Sunset Boulevard, Ninth Floor<br>Los Angeles, CA 90069-3604<br>(310) 277-8300; (310) 552-3209 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding   ☒ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** 550,000.00

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
18 USC Section 1961

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☒ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | **IMMIGRATION** | ☐ 445 American with Disabilities – Employment | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities – Other | ☐ 640 R.R.& Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 465 Other Immigration Actions | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

CV11-02335

| | |
|---|---|
| **FOR OFFICE USE ONLY:**   Case Number: _____ | |

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

American LegalNet, Inc.<br>www.FormsWorkflow.com

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | Los Angeles |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | Los Angeles |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date March 18, 2011

   **Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM**
Authority for Civil Cover Sheet

The CV-71 (JS-44 ) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I. (a)   PLAINTIFFS - DEFENDANTS.  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a Government Agency use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official giving both name and title.

   (b)   County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: in land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   (c)   Attorneys.  Enter firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section ("see attachment").  Refer to Local Rules 83-2.7 and 41-6 for further information regarding change of attorney name, address, firm association,  phone number, fax number or e-mail address, and dismissal of action for failure of pro se plaintiff to keep Court apprised of current address.

II.   JURISDICTION.  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdiction be shown in pleadings.  Place an "**X**" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

   United States Plaintiff.   (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

   United States Defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "**X**" in this box.

   Federal Question.  (3) This refers to suits under 28 U.S.C. 1331 where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, and act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code take precedence and box 1 or 2 should be marked.

   Diversity of Citizenship.  (4) This refers to suits under 28 U.S.C. 1332 where parties are citizens of different states.  When box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below)  (Federal question actions take precedence over diversity cases.)

III.   RESIDENCE (CITIZENSHIP) OF PRINCIPAL PARTIES.  This section of the CV-71(JS-44) is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.   ORIGIN.  Place an "**X**" in one of the seven boxes:

   (1)   Original Proceedings.  Cases which originate in the United States District Courts.
   (2)   Removed from State Court.  Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. Section 1441.  When the petition for removal is granted, check this box.
   (3)   Remanded from Appellate court.  Check this box for cases remanded to the district court for further action.  Use the date of remand as thefiling date.
   (4)   Reinstated or Reopened.  Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
   (5)   Transferred from Another District.  For cases transferred under Title 28 U.S.C. Section 1404(a).  DO NOT use this for within-district transfers or multidistrict litigation transfers.  When this box is checked, DO NOT check (6) below.
   (6)   Multidistrict Litigation.  Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, DO NOT check (5) above.
   (7)   Appeal to District Judge from Magistrate Judge Judgment.  Check this box for an appeal from a magistrate judge's decision.

V.   REQUESTED IN COMPLAINT.
   *Class Action.*  Place an "**X**" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   *Demand.*  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.
   *Jury Demand.*  Check the appropriate box to indicate whether or not a jury is being demanded.

VI.   CAUSE OF ACTION.  Report the civil statute directly related to the cause of action and give a brief description of the cause of action.  Do not cite jurisdictional statues unless diversity.                    Example:  U.S. Civil Statue: 47 USC 553
                    Brief Description: Unauthorized reception of cable service

VII.   NATURE OF SUIT.  Place an "**X**" in the appropriate box.   MARK ONE BOX ONLY.  If the cause of action fits more than one nature of suit, select the one that best describes your cause of action..

VIII (a)  IDENTICAL CASES.  Indicate if an identical action has previously been filed and dismissed, remanded or closed.  Insert the docket number and judge's  name, if applicable.
    (b)  RELATED CASES.  This section of the CV-71 (JS-44)) is used to reference related cases, if any.   If there are related cases, insert the docket numbers and the corresponding judge's name for each case.  Check all boxes that apply.

IX.   VENUE.  This section of the CV-71 (JS-44) is used to identify the correct division in which the case will be filed.  Please remember to indicate the residence of EACH plaintiff and defendant and the county or state  in which each claim arose.

   If the United States government or an agency thereof is a plaintiff or defendant, place an "**X**" in the appropriate box.  Indicate the residence of other parties, if any.

   In each category: for each party and claim, indicate the county, if in California.  If other than California, you need only to list the state or country.

X.   Attorney or party appearing pro per must sign and date this form.

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 9200 Sunset Boulevard, Ninth Floor, Los Angeles, California 90069-3604.

On March 18, 2011, I served true copies of the following document(s) described as **CIVIL CASE COVER SHEET** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Resch Polster & Berger LLP's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 18, 2011, at Los Angeles, California.

Janaki Neptune

414902.1

1       **SERVICE LIST**

2

3   David M. Marcus                          Attorneys for Plaintiffs
    Marcus Watanabe & Dave LLP
4   1901 Avenue of the Stars, Suite 300
    Los Angeles. California 90067-6005
5
    Michael Kerry Burke                      Attorneys for Plaintiff
6   Burke & Associates
    1901 Avenue of the Stars, Suite 300
7   Los Angeles, California 90067-6005

8

9   Ronald Richards                          Attorneys   for   Defendant   Bret
    Law Offices of Ronald Richards & Associates,   Saxon
    A.P.C.
10  P.O. Box 11480
    Beverly Hills. CA  90213
11
    Dana M. Cole                             Attorneys for Defendants Conduit
12  Cole & Loeterman                         Media, Inc. and TMP, Inc.
    1925 Century Park East, Suite 2000
13  Los Angeles, California 90067

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

414902.1